Bobby MESHEW, Administrator of the Estate of Robert Jeter (Deceased), Appellant/Cross–Appellee,

v.

James Alan WHITLOCK, Appellee/Cross– Appellant.

Nos. 1998–CA–001435–MR, 1998–CA–001486–MR.

Court of Appeals of Kentucky.

Dec. 23, 1999.

Michael W. Hogancamp, Bardwell, for Appellant/Cross–Appellee.

Thomas L. Osborne, P.S.C., Paducah, Matthew F. Coogle, Whitlow, Roberts, Houston & Straub, Paducah, for Appellee/Cross–Appellant.

BEFORE: COMBS, JOHNSON, and KNOPF, Judges.

## OPINION

KNOPF, Judge:

Bobby Meshew, administrator of the estate of Robert Jeter (deceased), appeals from a May 15, 1998, judgment of the Carlisle Circuit Court. The trial court concluded that certain shares of bank stock are property of the estate rather than survivorship property passing directly to Jeter's widow, Louise Jeter. Appellee James Whitlock, Jeter's son, cross-appeals from the same judgment. He maintains that the trial court erroneously excluded certain other assets from the decedent's estate. Agreeing with the administrator that the trial court misconstrued the statutes pertaining to the bank stock, we reverse the judgment on that

issue, but finding no other error, we affirm the judgment in all other respects.

### The Administrator's Appeal

In December 1984, the Carlisle Ban-Corp, Inc. (a holding company of the Citizens Deposit Bank of Arlington (the bank)) issued to Robert Jeter, in his name alone, stock certificate number 47 evidencing his ownership of one hundred (100) shares of the corporation's stock. Jeter died intestate in December 1994. Shortly after Jeter's death, the stock certificate was found in his lock box at the bank, and the owner's line had been altered. Whereas originally it had read simply "Robert Jeter," it then read "Robert Jeter or Louise Jeter." It is undisputed that the bank's president, at Jeter's request, had the corporation's secretary alter the certificate in this manner. She made a similar alteration to the corporation's transfer ledger. Neither the bank's president nor the corporate secretary could recall when they had made these changes, but both testified (during depositions) that they had done so prior to Jeter's death.

The administrator of Jeter's estate (the appellant), believing that Jeter's alteration of his certificate had effected the transfer of a survivorship interest in the stock to his wife, did not seek to include the shares of stock in the estate. Jeter's son objected. In August 1995, he brought the current action against the administrator. His complaint alleged that Jeter's estate comprised both real and personal property and that he (Whitlock) was entitled to an intestacy share thereof. By subsequent motion, Whitlock alleged specifically that the one hundred (100) shares of Carlisle Ban-Corp, Inc. stock should have been included in Jeter's estate. The trial court agreed. Although it found that Jeter had intended to give a survivorship interest in the stock to his wife and that the bank's president and the corporation's secretary had altered the stock ownership documents in the manner described above, it held that, under KRS Chapter 355 (Kentucky's Uniform Commercial Code (UCC)), Jeter's failure to indorse the certificate was fatal to his attempt to effect a transfer. We disagree.

The facts with respect to this issue having been stipulated, the trial court's judgment was based strictly on its construction of KRS Chapter 355. We note the familiar rule that the construction and application of a statute is a matter of law and is to be reviewed *de novo* by an appellate court. *Louisville Edible Oil Products, Inc. v. Revenue Cabinet Commonwealth of Kentucky,* Ky.App., 957 S.W.2d 272 (1997). We note, too, for reasons soon to be apparent, that KRS Chapter 355 is "intended as a unified coverage of its subject matter, no part of it shall be deemed to be impliedly repealed by subsequent legislation if such construction can reasonably be avoided." KRS 355.1–104.

The trial court's task in determining the effect of Jeter's having altered his stock certificate was complicated by the fact that KRS 355.8, the article of the UCC concerned with investment securities, had undergone a significant revision between the advent of this controversy and its arrival before the court. Our duty, as was the trial court's, is to construe the statutory provisions as they existed at the time of Jeter's attempted transfer. That attempt occurred between 1987 and 1996, the last two times the pertinent portions of KRS Chapter 355 were revised. We are concerned primarily, therefore, with the 1987 version of the statute. We are persuaded, however, and hope to show, that the 1996 revision, at least with respect to the issue raised here, was intended to clarify rather than amend the UCC and thus that the current version of the pertinent sections of the statute is consistent with and supports our construction of the earlier version. *Democratic Party of Kentucky v. Graham,* Ky., 976 S.W.2d 423 (1998).[1] To simplify

---

1. The 1996 revision of Kentucky's UCC article 8 adopted the American Law Institute's uni-

our comparison of the two versions, we have laid out related sections side-by-side.

It is well to note at the outset that the stock shares at issue are securities as defined at KRS 355.8–102(o)[2] and that the stock certificate is a "security certificate."[3]

We are concerned with both the acquiring (Did Louise acquire?) and the transferring (Did Robert transfer?) of interests in securities. The UCC provided and provides as follows:

form revisions of 1994. According to the Institute's prefatory comments, those revisions were intended to clarify the distinction between the traditional system of direct securities holding, whereby an investor may obtain securities issued in his or her own name, and the evolving system of indirect holding, whereby the investor holds through a broker or other intermediary. As the revisors explained, "[w]ith respect to securities held directly, Revised Article 8 retains the basic conceptual structure and rules of present law.... Part 3 deals with transfer for securities held directly. One of its principal purposes is to apply to investment securities the principles of negotiable instruments law that protect purchasers of negotiable instruments against adverse claims.... Although the basic concepts of the direct holding system rules have been retained, there are significant changes in terminology, organization, and statement of the rules." "Uniform Commercial Code Revised Article 8. Investment Securities. Proposed Final Draft," prefatory note § II B (April 5, 1994).

2. "Security," except as otherwise provided in KRS 355.8–103, means an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise or an issuer: 1. Which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer; ...

3. KRS 355.8–102(p): "Security certificate" means a certificate representing a security.

## 1987 Version

355.8-313(1) Transfer of a security or a limited interest (including a security interest) therein to a purchaser occurs only: (a) At the time he or a person designated by him acquires possession of a certificated security; . . . (e) With respect to an identified certificated security to be delivered while still in the possession of a third person, not a financial intermediary, at the time that person acknowledges that he holds for the purchaser; . . .

355.1-201(32) "Purchase" includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property.

355.1-201(33) "Purchaser" means a person who takes by purchase.

355.8-301(1) Upon transfer of a security to a purchaser (KRS 355.8-313) the purchaser acquires the rights in the security which his transferor had or had actual authority to convey unless the purchaser's rights are limited by KRS 355.8-302(4). (2) A transferee of a limited interest acquires rights only to the extent of the interest transferred. . . .

## 1996 Version

355.8-104(1) A person acquires a security or an interest therein, under this article, if: (a) The person is a purchaser to whom a security is delivered pursuant to KRS 355.8-301; . . .

355.1-201(32) "Purchase" includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property.

355.1-201(33) "Purchaser" means a person who takes by purchase.

355.8-301(1) Delivery of a certified security to a purchaser occurs when: (a) The purchaser acquires possession of the security certificate; (b) Another person, other than a securities intermediary, either acquires possession of the security certificate on behalf of the purchaser or, having previously acquired possession of the certificate, acknowledges that it holds for the purchaser; . . .

355.8-302(1) Except as otherwise provided in subsections (2) and (3) of this section, upon delivery of a certificated or uncertificated security to a purchaser, the purchaser acquires all rights in the security that the transferor had or had power to transfer. (2) A purchaser of a limited interest acquires rights only to the extent of the interest purchased.

■ Although the 1987 version of the UCC does not define the delivery requirement as clearly as does the 1996 version, it is apparent that, under both versions, the transfer of an interest in a security requires that the transferor intend the transfer (as evidenced by a sale, gift, or some other transaction) and that the transfer be completed by some manner of delivery. The delivery, however, need not be directly to the transferee, but can be to a qualifying third person (including the transferor him or herself). This third person, however, must clearly acknowledge that he or she holds for the transferee. It was entirely proper, therefore, for Jeter to give his wife an interest in his shares of stock and to deliver them to her by holding them for her himself, provided that he acknowl-

edged he was doing so. His alteration of the stock certificate to include Louise and the similar alteration of the corporate records, we believe, was a suitable acknowledgment.[4] *See Andrews v. Troy Bank and Trust Company*, 529 So.2d 987 (Ala. 1988) (discussing the delivery requirement under Alabama's very similar version of the U.C.C.).

Whitlock cites numerous pre-code cases indicating that, in other contexts, this manner of delivery would not be sufficient. In light of the express delivery provisions in the UCC, however, Whitlock's reliance on pre-code authority is unavailing. Much of this authority, moreover, is factually distinguishable. In *Biehl v. Biehl's Adm'x*, 263 Ky. 710, 93 S.W.2d 836 (1936), for instance, following the brother's death, an alleged inter vivos transfer of stock from him to his sister was disallowed, in favor of the brother's widow, because the sister had failed to prove that the endorsed certificates had been delivered. The sister's testimony was the only evidence of delivery, and our highest Court ruled that she was incompetent to give evidence on that point. In the case before us, however, competent evidence of delivery came from the bank president and the corporate secretary, who both testified that Jeter had acknowledged the gift to his wife and the fact that, thenceforth, he held the certificate on behalf of his wife and himself jointly. Sufficient evidence of delivery distinguishes this case from *Biehl.*

■ But what about Jeter's failure to indorse the certificate? Did that failure negate, as the trial court believed, what might otherwise have been a valid transfer? We are persuaded that it did not:

4. Consider the comment in Anderson, Ronald A., *Anderson on the Uniform Commercial Code*, [Rev] § 8–302:8 (1994): "A common form of transfer of a limited interest in securities is the creation of a cotenancy by the sole owner of the securities. Thus when A, the owner of securities[,] creates a joint tenancy in which A and B are the joint tenants, B has acquired a limited interest.

"Local pre-Code property law will determine the mechanics of such a transfer. In some states it may be necessary for A to transfer the securities to X who then transfers them to A and B as joint tenants. In other states, A may make the transfer directly from A to A and B as joint tenants. Regardless of the mechanics required to effect the result, the result is still the same as far as the Code is concerned. That is, B has the rights and only the rights that A intended." Kentucky law permits the transfer of personal property directly from A to A and B as joint tenants. *Saylor v. Saylor*, Ky., 389 S.W.2d 904 (1965); *Scherzinger v. Scherzinger*, 280 Ky. 44, 132 S.W.2d 537 (1939).

**1987 Version**

355.8-307: If a certificated security in registered form has been delivered to a purchaser without a necessary indorsement he may become a bona fide purchaser only as of the time the indorsement is supplied; but against the transferor the transfer is complete upon delivery and the purchaser has a specifically enforceable right to have any necessary indorsement supplied.

355.8-309: An indorsement of a certificated security, whether special or in blank, does not constitute a transfer until delivery of the certificated security on which it appears or, if the indorsement is on a separate document, until delivery of both the document and the certificated security.

**1996 Version**

355.8-304(4): If a security certificate in registered form has been delivered to a purchaser without a necessary indorsement, the purchaser may become a protected purchaser only when the indorsement is supplied. However, against a transferor, a transfer is complete upon delivery and the purchaser has a specifically enforceable right to have any necessary indorsement supplied.

355.8-304(3): An indorsement, whether special or blank, does not constitute a transfer until delivery of the certificate on which it appears or, if the indorsement is on a separate document, until delivery of both the document and the certificate.

■ While the trial court is correct to insist that an indorsement accompanied by a request for the issuance of a new certificate is the preferred manner of transferring a direct interest in an investment security, and is further correct to the extent that an indorsement is necessary if the transferee is to enjoy the status of a protected purchaser ('bona fide purchaser' under the 1987 version of the UCC), nevertheless, the statute, both now and in 1987, plainly contemplates that transfers will sometimes occur without an indorsement.[5] An indorsement is thus neither a necessary nor a sufficient condition for the transfer of an interest in an investment security.

What is necessary, as noted above, is the clear expression of an intent to transfer and, at least in the case of certificated securities, a delivery to the transferee or to an eligible third person on the transferee's behalf. The trial court found on the basis of substantial evidence that Jeter intended to give his wife a survivorship interest in his shares of bank stock.[6] We believe, moreover, as discussed above, that his alteration of the security certificate and the accompanying alteration of the corporation's transfer ledger sufficiently acknowledged delivery to himself on behalf of his wife. The lack of an indorsement, therefore, does not defeat Louise's claim to the stock.

5. The official comment to section 304(d) of article 8 reads in part as follows:
   Subsection (d) deals with the effect of delivery without indorsement. As between the parties the transfer is made complete upon delivery, but the transferee cannot become a protected purchaser until indorsement is made.

6. It is not seriously disputed that Jeter intended Louise to have a survivorship interest rather than some other interest, such as that of a

tenant in common. We agree with the trial court that the evidence of Jeter's giving Louise a survivorship interest in other securities, the testimony of the bank president and corporate secretary to the effect that Jeter intended a survivorship interest with respect to the bank stock, and the fact that the certificate was altered to say Jeter "or" Louise adequately supports this conclusion. *Saylor v. Saylor*, Ky., 389 S.W.2d 904 (1965).

■ Nor is her claim defeated by the fact that the certificate was altered. The trial court's invocation of KRS 355.8–206, which concerns, among other things, the effects of improper alterations to certificates, is not apt. As explained by Liebson and Nowka in their treatise on Kentucky's UCC, the alteration provision in article 8, like the comparable provision in article 3 (KRS 355.3–407), is primarily intended to protect the original contracting parties, not strangers, such as Whitlock, who are only indirectly affected by the agreement.[7] Here, however, it was the original contracting parties themselves, Jeter and the issuing corporation, who consented to and participated in the alteration of the certificate. In these circumstances, KRS 355.8–206 does not apply. Louise thus acquired a survivorship interest in the bank shares, and, as Jeter's survivor, is entitled to an order directing the corporation to issue her a new certificate.

### Whitlock's Cross-appeal

■ Whitlock testified that, within nine (9) months prior to Jeter's death, he, Whitlock, had seen in his father's possession two certificates of deposit worth at least $70,000.00. The certificates had been issued in Robert Jeter's name alone. Whitlock argued that those certificates should have been included in Jeter's estate. Following Jeter's death, however, no such certificates were discovered, nor were bank records documenting the issuance of such certificates produced. The trial court ruled, in essence, that Whitlock had failed to meet his burden of proof on this issue. Accordingly, it denied his claim for a share of the alleged $70,000.00. Whitlock cross-appeals from this portion of the trial court's judgment. He argues that there is still a genuine factual dispute concerning the existence of the certificates and, thus, that summary judgment on the issue was pre-mature.

■ The problem with Whitlock's argument is that the trial court ruled not by way of summary judgment (CR 56), but by way of trial upon the facts without a jury (CR 52). To be sure, the appellee had moved for summary judgment, and, on at least two occasions, that motion had been addressed by the trial court as such. In its final judgment, however, the trial court

determined the issues could better be decided on the merits than in the framework of a motion for summary judgment; further, the parties having agreed to allow the Court to proceed to make factual findings in this case, and the Court having considered the entire record, including the affidavits and pleadings of the parties, the Court finds as follows: . . .

There is no record of Whitlock's having moved for a new trial following this judgment or for additional findings on the missing-certificates-of-deposit issue. This omission rendered the summary judgment motion moot. *Transportation Cabinet, Bureau of Highways, Commonwealth of Kentucky v. Leneave,* Ky.App., 751 S.W.2d 36 (1988). Accordingly, our standard of review is not, as Whitlock suggests, whether the trial court erred in determining that proof of Whitlock's claims would be virtually impossible at trial. Rather, we must ask whether the trial court clearly erred in finding that Whitlock had failed to prove the existence of the non-survivorship property he alleged. CR 52.01.

The trial court was not clearly erroneous in so finding. Noting that Whitlock had failed to offer any concrete proof that the certificates existed, the trial court ruled that, if there had been any such mature certificates of deposit, Jeter had probably converted them to cash and added the cash to one of Louise's survivorship accounts. Whitlock maintains that, during the final nine (9) months of his life, Jeter was in-

---

7. *See* Liebson, David J. and Richard H. Nowka, *The Uniform Commercial Code of Kentucky, 2*nd *ed.,* § 9.3(F) (1992, supp.1998).

competent to make such a gift. Whitlock did not prove this at trial, however, and there was competent testimony to the contrary. Proof on this issue was unnecessary, moreover, because Whitlock failed to establish that the certificates had ever existed to be given away.

In sum, we agree with the appellant/administrator that, under article 8 of the UCC, Jeter validly transferred to his wife a survivorship interest of one hundred (100) shares of Carlisle BanCorp, Inc. stock. We therefore reverse the portion of the trial court's May 15, 1998, judgment holding to the contrary and remand for issuance of an order consistent with this opinion. Otherwise, we affirm the judgment of Carlisle Circuit Court, in particular that portion of it denying for lack of proof cross-appellant Whitlock's claim for an intestacy share of approximately $70,000.00 alleged to have been improperly diverted from the decedent's estate.

ALL CONCUR.