In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-4058

IN RE:

MICHAEL V. FRIERDICH, SR.,

*Debtor,*

*v.*

STEVEN V. MOTTAZ, Trustee of the Estate of
Michael V. Frierdich, Sr.,

*Plaintiff-Appellee,*

*v.*

BEVERLY OSWALD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 01-CV-302-DRH—**David R. Herndon**, *Judge.*

ARGUED MAY 20, 2002—DECIDED JUNE 21, 2002

Before EASTERBROOK, ROVNER, and EVANS, *Circuit
Judges.*

EVANS, *Circuit Judge.* Michael Frierdich is a Chapter 7
debtor, which means, in simplest terms, that he does not
have enough assets to pay off a staggering amount of debt.
This case, between the bankruptcy trustee (Mottaz) and
Frierdich's wife (Oswald), turns on when Frierdich trans-

ferred shares of stock (or their proceeds, worth $400,000) to Oswald. The answer to that question affects whether Mottaz can upset the transfer and obtain its proceeds for distribution to Frierdich's creditors. Oswald, who would just as soon keep the $400,000, has already had two swings at this issue. She lost before the bankruptcy judge and the district judge. We will ring her up on strikes.

Because this case arose on summary judgment, we state the facts in the light most favorable to Oswald. We turn first to the events of early 1998. At that time, Frierdich was a director and the treasurer of Columbia Centre, Inc., a closely held company, and owned 360 of its outstanding 1,000 shares. Paul Frierdich (his brother) and Joe Koppeis held the remaining shares. (Paul and Michael Frierdich both submitted affidavits saying that Columbia Centre never issued stock certificates to its shareholders. A certificate—"Certificate #6"—evidencing Frierdich's shares turned up but had never been signed.) The stock record book was also lost.

Meanwhile Frierdich and Oswald were pondering the business of marriage. In anticipation of their engagement, they decided to take stock of their respective financial situations. Based on information that Frierdich provided to Oswald, they determined that the value of Frierdich's estate exceeded that of Oswald's. So they assented to an arrangement under which Frierdich would transfer his Columbia Centre stock to Oswald and she would waive any interest in Frierdich's estate. On January 7, 1998, Frierdich and Oswald were engaged.

The next day Frierdich executed a "Stock Transfer/Stock Power." It assigned to Oswald his interest in the stock and gave the officers of Columbia Centre power of attorney to transfer the stock on the company books. On January 16 Frierdich sent the transfer document, along with transfer instructions, to Paul Frierdich. The transmittal letter

read: "Please transfer stock as of Jan. 8, 1998 to Bev. This is part of the prenuptial agreement we have. Call if any questions." On February 10 Paul Frierdich sent a "speed message" reading:

> Mike and Bev-
>
> I received your stock transfer of all Mike's stock in Columbia Centre Inc. Shopping Center Corporation, and accordingly the transfer to Bev Oswald of his 36%. We do not need anything else for the transfer.

Oswald never received a stock certificate and no notation on the (missing) stock record book was ever made.

Frierdich and Oswald each signed a prenuptial "waiver" to any interest in the other's estate on March 4. Paragraph six of Oswald's waiver read:

> It is the intent of the undersigned that her present and future interest in any assets of Michael V. Frierdich is specifically limited to those assets which Michael V. Frierdich shall have voluntarily transferred an interest to the undersigned and only then in circumstances wherein he has affirmatively taken action transferring an ownership interest to the undersigned. Reference herein includes interest Michael V. Frierdich has previously and voluntarily, by execution of a stock transfer, assigned all his rights, title, and interest in and to his stock ownership in a Columbia, Illinois shopping center to Beverly K. Oswald.

Frierdich and Oswald were married 3 days later.

In August or September of 1998, Koppeis and Paul Frierdich approached Frierdich about having the corporation repurchase his shares in Columbia Centre. They offered him $250,000, a price that increased, based on financial appraisals, to $400,000. Koppeis, who was Columbia Centre's president and managing officer, was not aware of any transfer to Oswald.

In September a sale agreement was forwarded to Frierdich. It listed him as the seller. On a draft of the agreement Frierdich crossed out his name, substituted "Bev Oswald" as the seller, and sent the documents back to Paul Frierdich with a transmittal letter reading: "I believe Bev needs to sign this because of the transfer document I gave her several months ago. The money should go to her." The final agreement of sale, however, again listed Frierdich as the seller. Frierdich signed that agreement, warranting that he held title to the stock and that it was not subject to any agreement that would restrict its sale. Koppeis and Paul Frierdich also signed the agreement. At closing, which apparently took place on September 10, Columbia Centre issued Frierdich a $400,000 check. He signed the receipt and deposited the check in Oswald's account after endorsing it "for deposit." At that same time, Frierdich resigned his positions with the company.

In a letter dated September 23, 1998, to Union Planters Bank, with which Oswald and Frierdich's son were trying to arrange a loan for a real estate purchase, Frierdich stated:

> I transferred some $400,000.00 to Beverly K. Oswald as a gift to a spouse, there are no gift tax consequences. There is an unlimited marital deduction for gifts to a spouse, and as such, this is the net amount for her to utilize. I sold my stock in a shopping center for a sum in excess of that amount and was only required to pay capital gains tax on some 20%. My interest in the shopping center was sold in 1998.

Involuntary bankruptcy proceedings commenced on February 17, 1999. Frierdich's schedules indicate that, as of the filing, he had debts of $8,530,395 and assets of $1,200. Twelve lawsuits were pending against Frierdich, five of which had been pending prior to September 10, 1998. The claims on file in the bankruptcy proceeding reflect debts in

excess of $400,000 incurred prior to January 1, 1998, including federal taxes of approximately $240,000 owing. Frierdich was also the major shareholder and guarantor of many of the debts of South of the Border, Inc., which had filed for bankruptcy (apparently in July 1998).

Mottaz, the trustee, filed this adversary proceeding against Oswald seeking to avoid Frierdich's transfer to her of the stock proceeds from the September 10, 1998 sale. The bankruptcy judge (Fines, J.), finding no dispute that the relevant transfer occurred in September, and not January, entered summary judgment for Mottaz in the amount of $400,000. He held, in the alternative, that even if the transfer occurred in January, it was voidable. Oswald appealed and the district judge affirmed.

In a second appeal from a bankruptcy court's decision, we apply the same standard of review as did the district court. *In re Marrs-Winn Co.*, 103 F.3d 584, 589 (7th Cir. 1996). Because this case was decided on summary judgment, *see* Fed. R. Bankr. P. 7056, our review is *de novo*.

This case implicates two avoidance provisions of the federal bankruptcy code. Title 11 U.S.C. § 548(a)(1)(A) provides that a trustee may avoid a transfer by a debtor made "within one year before the date of the filing" of the bankruptcy petition if the debtor "made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted."[1] Title 11 U.S.C. § 544(b)(1) allows the trustee to commandeer the

---

[1] This subsection has been referred to as the "actual fraud" avoidance provision because of its "intent ingredient." *See, e.g., In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1394 (7th Cir. 1996). Mottaz also argues, and the bankruptcy judge also found, that the transfer is voidable under the "constructive fraud" provision found in 11 U.S.C. § 548(a)(1)(B). Because, as we will discuss, we affirm the bankruptcy judge's holding under § 548(a)(1)(A), we don't dwell on Mottaz's § 548(a)(1)(B) argument.

rights of an unsecured creditor who could have avoided the transfer under applicable law, in this case the Illinois Fraudulent Transfer Act. *See* 740 Ill. Comp. Stat. 160/5. For our purposes the key difference between these two avoidance routes is that the Illinois Fraudulent Transfer Act does not contain a one-year "look back" provision. Thus if the transfer in the present case occurred in January of 1998, it occurred more than one year before the February 17, 1999, bankruptcy filing and would fall outside of § 548's one-year "look back" provision. Mottaz would then be relegated to avoiding the transfer under § 544. If, on the other hand, the transfer did not occur in January, but rather occurred when the proceeds of the stock sale were deposited in September 1998, the transfer would fall within one year of the February 1999 bankruptcy filing and could be avoided, if there was actual intent to defraud, under § 548(a)(1)(A). The burden of proving a fraudulent transfer under § 548 is on the trustee. 5 *Collier on Bankruptcy* ¶ 548.10, p. 548-80 (15th ed. rev. 2002).

So to the key issue we turn: whether Frierdich transferred his Columbia Centre stock to Oswald in January of 1998. Under the bankruptcy code,

> a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee.

11 U.S.C. § 548(d)(1). This provision presumes a "transfer," which the bankruptcy code defines as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(54). Although this definition of transfer is obviously federal, its references to "property" and "interest in property" require an analysis of whether a

property interest was created under state law. *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992); *In re Atchison*, 925 F.2d 209, 210-11 (7th Cir. 1991) ("Absent a federal provision to the contrary, a debtor's interest in property is determined by applicable state law.").

Columbia Centre is an Illinois corporation and the parties and courts below have applied Illinois law, so we apply it as well. *In re Marrs-Winn*, 103 F.3d at 591.

Oswald argues that she acquired the stock pursuant to a prenuptial agreement under which she waived her interest in Frierdich's estate in exchange for the stock transfer. This qualifies her, she argues, for "protected purchaser" status under section 303 of Article 8 of the Illinois Commercial Code. (Certain provisions of Article 8 were revised in 2000 and the revisions became effective July 1, 2001. *See* 2000 Ill. Legis. Serv. 91-893, § 99. Because the events in this case occurred in 1998, we will be applying the relevant provisions of Article 8 as they stood at that earlier time.) Section 8-303(a) defines a "protected purchaser" as "a purchaser of a certificated or uncertificated security" who gives value, does not have notice of an adverse claim to the security and obtains "control" of the security. 810 Ill. Comp. Stat. 5/8-303(a)(1)-(3). Oswald charges ahead to argue that she can show value, no notice and control, and thus concludes that she acquired an interest as a "protected purchaser."

She has put the cart before the horse. To be a "protected purchaser" she must first show that she is a "purchaser" of the security, which, unfortunately for her, is the key issue in this case. A "purchaser" (to no one's surprise) is "a person who takes by purchase." 810 Ill. Comp. Stat. 5/1-201(33). The Code adds that a purchase "includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift or any other voluntary transaction creating an interest in property." 810 Ill. Comp. Stat. 5/1-201(32).

Oswald claims to have taken by prenuptial agreement. That argument confronts two problems. First, even assum-

ing the parties had a valid agreement pursuant to which Frierdich would transfer the stock, delivery is required to effectuate the transfer. 12 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5481, p. 240 (rev. ed. 1996); *cf. Meshew v. Whitlock*, 9 S.W.3d 581, 585 (Ky. Ct. App. 1999) (interpreting 1994 revision of UCC, adopted by Kentucky in 1996). And, on that point, Oswald hits a snag. Although Article 8 may not provide the exclusive means of delivery, 12 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5481, p. 242 (rev. ed. 1996), Oswald has not cited Illinois law validating other types of delivery (and our research has uncovered none), so we analyze whether delivery was accomplished under Article 8.[2] Section 8-301 specifies when delivery occurs in the case of both certificated and uncertificated securities. The parties have had some back and forth about whether the shares in this case should be classified as certificated or uncertificated, an argument that seems inconsequential. Even assuming Oswald's premise that the shares were uncertificated, she cannot show delivery.

Delivery of an uncertificated security occurs when "the issuer registers the purchaser as the registered owner," 810 Ill. Comp. Stat. 5/8-301(b)(1), or "another person . . . either becomes the registered owner of the uncertificated security on behalf of the purchaser or, having previously become the registered owner, acknowledges that it holds for the purchaser." 810 Ill. Comp. Stat. 5/8-301(b)(2). Oswald cannot

---

[2] Oswald is steadfast in arguing that the transfer was not a gift, so we have not referenced the Illinois law of gifts to determine if delivery occurred. *But see* 7A William D. Hawkland & James S. Rogers, *Uniform Commercial Code Series* [Rev] § 8-302:02, pp. 425-26 (1996) ("It is possible that under the general law of gifts acts that would not constitute an Article 8 'delivery' under section 8-301 would suffice as a delivery within the meaning of the requirement of delivery imposed by the law of gifts.").

prevail under section 8-301(b)(1) because Columbia Centre never registered her as the owner of the stock. (Its stock book was missing.) Section 8-301(b)(2) is a closer call but also unavailing. Frierdich attempted to register the stock in Oswald's name, not hold it for her. He executed a "Stock Transfer/Stock Power," which attempted to assign the stock and gave the officers of Columbia Centre power of attorney to change the name in the stock book. The transmittal letter to Paul Frierdich read: "Please transfer stock as of Jan. 8, 1998 to Bev." Paul Frierdich responded on February 10 that he had "received your stock transfer of all Mike's stock in Columbia Centre, Inc. Shopping Center Corporation, and accordingly the transfer to Bev Oswald of his 36%." Frierdich clearly did not intend to remain in possession of the stock on behalf of Oswald. He wanted to register it in her name, an attempt that failed under section 8-301(b)(1).

If this seems an overly technical interpretation of section 8-301(b)(2) based on the facts of January and February 1998 alone, later events make clear that Frierdich continued to be the stock's real owner. Six months after the purported transfer, Paul Frierdich and Koppeis (who, as we said, was unaware of any January transfer) approached *Frierdich* to buy the shares. Although Oswald stated that she was involved in discussions concerning the stock sale, she did not negotiate the price for her purported property. Rather, "they just came up with the amount." Moreover, although Frierdich attempted to have Oswald's name put on the sale agreement, he didn't try very hard. Frierdich went ahead and signed the (unrevised) final agreement, which listed him as the seller. He warranted that he held title to the shares; he also received the $400,000 purchase price. And even though he deposited the check in Oswald's account, Frierdich wrote to Union Planters Bank, in what appears to have been the hope that Oswald and his son would obtain funding for a real estate purchase, that the transfer was a marital "gift" (which

would not be taxed). Any force behind that assertion, of course, necessarily assumed that the transfer occurred *after* the Frierdich-Oswald union in March of 1998. The bankruptcy court did not err by finding no dispute of fact that Oswald did not acquire the stock in the winter of 1998.

The second problem with Oswald's "prenuptial" theory is that, even apart from a failure of delivery, she never obtained an enforceable interest in the stock. Illinois law requires that a premarital agreement be in writing, 750 Ill. Comp. Stat. 10/3. The writing that purports to be the prenuptial agreement in this case consists of two matching "waivers," one signed by Oswald, the other signed by Frierdich. Nowhere does Oswald's waiver recite the stock transfer, which occurred 3 months prior to this time, as connected to the waiver. Oswald's waiver merely states that her interest was limited to stock (purportedly) in her possession already. The fact that Frierdich voluntarily transferred the stock to "calibrate" the estates 3 months earlier did not give Oswald an interest, enforceable in law or equity, in the stock.

Accordingly, Oswald did not take an interest in the stock until Frierdich deposited the proceeds from its sale into her account in September of 1998. That transfer was 5 months before the February 1999 bankruptcy filing and, therefore, well within the one-year provision of 11 U.S.C. § 548.

The transfer is therefore voidable if it was done with actual intent to defraud under 11 U.S.C. § 548(a)(1)(A). We find nothing wrong with the bankruptcy judge's conclusion that there was no dispute that Frierdich transferred the proceeds with actual intent to defraud. Direct proof of actual intent to defraud is not required—indeed, it would be hard to come by—and a trustee can prove actual intent by circumstantial evidence. 5 *Collier on Bankruptcy* ¶548.04[2][a], p. 548-25 (15th ed. rev. 2002). Courts often look to "badges of fraud" as circumstantial evidence. *Id.*

¶ 548.04[2][b], p. 548-26; *see also In re XYZ Options, Inc.*, 154 F.3d 1262, 1271-72 (11th Cir. 1998). These "badges" include: whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became solvent at the time of the transfer. 5 *Collier on Bankruptcy* ¶ 548.04[2][b], pp. 548-26 to 548-28 (15th ed. rev. 2002).

The trustee presented evidence that Frierdich transferred a substantial sum of money, $400,000, to a close relative, his wife, and received nothing in return. In Frierdich's own words to Union Planters Bank, the transfer was a "gift." He made this gift in the midst of his own financial demise. The bankruptcy judge did not err by taking judicial notice of the schedules filed in the underlying bankruptcy proceeding. *See In re Steffens*, 148 B.R. 914, 916 (W.D. Mo. 1993); *Mitchell v. Western Data Processing Servs., Corp.*, 75 B.R. 825, 828 (D.P.R. 1987). Those schedules indicate that as of February 17, 1999, Frierdich's balance sheet was a sorry $8,529,195 in the red. They also reveal that five lawsuits against Frierdich were pending prior to September 10, 1998.[3] Although a debtor's schedules, often filed months after the time of transfer, may not be probative of the

---

[3] The claims on file in the bankruptcy proceeding revealed debts in excess of $400,000 incurred before January 1, 1998, including federal taxes owing in the amount of approximately $240,000. The bankruptcy judge also took notice of a related bankruptcy proceeding, apparently filed in July 1998, involving South of the Border, Inc., a company for which Frierdich was the major shareholder and had guaranteed many debts.

earlier time, it simply blinks reality to think that Frierdich incurred $8,530,395 worth of debt and (innocently) dwindled his assets to $1,200 in the 5 months between September 1998 and February 1999. Moreover, Koppeis stated that, prior to the September stock sale, the IRS was garnishing $1,000 of Frierdich's monthly $1,500 "director's fee" from Columbia Centre. In sum, no reasonable fact finder could conclude that Frierdich did not have an actual intent to defraud his creditors in September 1998.

Because we find that the bankruptcy judge did not err by concluding that Frierdich's September transfer was voidable, we need not address his alternative holding that had the transfer occurred in January, it would have run afoul of the Illinois Fraudulent Transfer Act and, therefore, been avoidable under § 544. In light of Frierdich's tax debts and his personal guarantees of the debts of a failing business, however, the bankruptcy judge was likely correct to conclude that any transfer at that time was also fraudulent and therefore voidable in the alternative under 11 U.S.C. § 544.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*