In re Thomas J. CAHILLANE, Debtor.

Gordon E. Gouveia, Plaintiff,

v.

Timothy J. Cahillane and New Technologies, Inc. a/k/a New Silicone Technologies, Inc., Defendants.

Bankruptcy No. 04–65210.
Adversary No. 06–6246.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

June 11, 2009.

Mark A. Carter, Esq., Adelman & Gettleman, P.C., Chicago, IL, on behalf of the Plaintiff, Chapter 7 Trustee Gordon E. Gouveia.

Kenneth A. Manning, Esq., James, James & Manning, P.C., Dyer, IN, on behalf of the Defendants, Timothy J. Cahillane and New Technologies, Inc.

## MEMORANDUM AND DECISION OF FINAL JUDGMENT/FINDINGS OF FACT AND CONCLUSIONS OF LAW

**J. PHILIP KLINGEBERGER,** Bankruptcy Judge.

This adversary proceeding was initiated by a complaint filed on October 13, 2006, by Gordon E. Gouveia, as Trustee of the Chapter 7 bankruptcy estate of Thomas J. Cahillane ("Trustee"). The complaint designated two defendants: Timothy J. Cahillane ("Timothy"), individually, and New Technologies, Inc. a/k/a New Silicone Technologies, Inc. ("New Silicone"). Subsequently, on November 2, 2006, the Trustee filed an amended complaint as to both Defendants. The underlying bankruptcy case itself was filed on October 15, 2004, by Thomas Cahillane—Timothy's brother.[1]

In the amended complaint, the Trustee alleged that Timothy and New Silicone were the recipients of certain preference payments pursuant to 11 U.S.C. § 547(b) and, as a result, the Trustee should be allowed to recover the transfers from the defendants as provided for by 11 U.S.C. § 550(a).[2] Furthermore, it is alleged that the debtor made several fraudulent trans-

---

1. *See, In re Thomas Cahillane,* Case No. 04–65210.

2. *See,* Count II and Count V of the amended complaint. As will be discussed *infra,* at some point New Technologies, Inc. changed its name to New Silicone Technologies, Inc.

This is the reason for the Plaintiff's use of the "a/k/a" notation in the caption of the complaint—to signal a corporate pseudonym. Throughout the amended complaint the Plaintiff refers to the corporate defendant as New Silicone Technologies, Inc.

fers to Timothy, which should be avoided pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B) and recovered from Timothy pursuant to 11 U.S.C. § 550(a).[3] Alternatively, the Trustee alleged that the foregoing transfers were made to New Silicone and should be avoided pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 548(a)(1)(B), and recovered from New Silicone pursuant to 11 U.S.C. § 550(a).[4] The Trustee also requested that the court pierce the corporate veil of New Silicone to hold Timothy liable for transfers made to the corporation, based upon the allegation that New Silicone was controlled and manipulated by the debtor and Timothy.[5] Finally, pursuant to 11 U.S.C. § 502(d), the Trustee requested that the court disallow any proof of claim Timothy may file in the Debtor's bankruptcy case to the extent Timothy is indebted to the estate for an avoidable transfer or transfers which are not subsequently paid back to the estate. In a separate count, the Trustee requested the same relief as to New Silicone.[6]

On January 16, 2007, the defendants filed an answer which denied the substantive allegations of the Trustee's complaint and raised certain affirmative defense. The defendants essentially contended that under 11 U.S.C. § 550(a), neither was an initial transferee, nor an entity for whose benefit the transfers were made. The defendants also denied that either of them was an immediate transferee under 11 U.S.C. § 550(b). The defendants take the position that, under principles of equity, neither of them should be liable as transferees. Lastly, Timothy Cahillane denies that he ever received any of the Debtor's property or that was he a recipient of the transfers as alleged by the Trustee.[7]

Trial of the case was held on March 13, 2008, at the conclusion of which, the court directed the parties to file briefs in support of their respective positions.

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157, and N.D.Ind. L.R. 200.1(a) of the Rules of the United States District Court for the Northern District of Indiana. This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(F) and (H). This Memorandum and Decision constitutes the findings of fact and conclusions of law required by Fed.R.Bankr.P. 7052/ Fed.R.Civ.P. 52(a).

## I. THE RECORD BEFORE THE COURT

The record before the court for the purposes of final determination is comprised of the plaintiff's amended complaint, the defendants' answer, the joint Pre–Trial Order filed February 15, 2008, the Stipulation Regarding Documentary Evidence, and the following exhibits entered into evidence at the trial:

A. Plaintiff's Binder of Exhibits, Volume I: Exhibits 1, 2A–2I and 3;[8]

3. *See,* Count III and Count IV of the amended complaint.

4. *See,* Count VI and Count VII of the amended complaint.

5. *See,* Count I of the amended complaint which alleges that the corporation was merely a vehicle for assisting the Debtor in evading his creditors.

6. *See,* Count VIII and Count IX of the amended complaint.

7. In the answer, the foregoing defenses are raised as to both New Silicone Technologies, Inc. and New Technologies, Inc. The defendants admit that these are not separate entities and that the legal name of New Silicone Technologies, Inc. was amended and changed to New Technologies, Inc.

8. The admissibility of Exhibit 3 is limited to the "Invoice" dated April 3, 2004—referencing New Silicone, and the excerpt of the deposition of Thomas Cahillane taken on De-

B. Plaintiff's Binder of Exhibits, Volume II: Exhibits 4A, 4B and 5–23;

C. Plaintiff's Binder of Exhibits, Volume III: Exhibits 24, 26A–26Z, 27, 29, 30 and 31;[9]

D. Defendants' Binder of Exhibits A–W;

E. Defendants' Exhibit X;

## II. ISSUES PRESENTED TO THE COURT

The issues of law presented by the parties to the court were stated as the following in the final Pre–Trial Order filed with the Court on February 15, 2008:

(1) Whether Timothy is liable for payments in excess of $10,300.00 made by Thomas to Timothy within one (1) year of the Petition Date pursuant to 11 U.S.C. § 547(b)?

(2) Whether Timothy is liable for payments in excess of $6,462.04 received by Timothy through the Mercantile Account within one (1) year of the Petition Date pursuant to 11 U.S.C. § 547(b)?

(3) Whether Timothy is liable for transfers made into the Mercantile Account in the amount of $11,3753.95 pursuant to 11 U.S.C. § 548(a)(1)(A) or 11 U.S.C. § 548(a)(1)(B)?

(4) Whether the corporate form of New Tech can be disregarded/ignored for failure to comply with corporate formalities and as a sham entity used as a fraud on creditors.

(5) The extent and liability of each Defendant as an initial transferee under 11 U.S.C. § 550(a)(1).

(6) The extent and liability of each Defendant as an entity for whose benefit any transfer was made under 11 U.S.C. § 550(a)(1).

(7) The extent and liability of each Defendant as an immediate/mediate transferee, 11 U.S.C. § 550(a)(2).

(8) The extent and liability of each Defendant as a first transferee under I.C. 32–18–2–18.

(9) The extent and liability of each Defendant as a subsequent transferee under I.C. 32–18–2–18.

(10) Does payment of an existing debt and obligation constitute fair consideration and reasonable equivalent value?

(11) When does pre judgment interest begin to accrue, and at what rate, on any judgment Plaintiff may obtain?

(12) Is Plaintiff entitled to attorney fees as part of any judgment?

(13) Is Plaintiff's damages and recovery limited to the extent of any transfers of Debtor's property received by a transferee?

(14) Does Plaintiff have the burden of proof to establish each Defendant's liability under 11 U.S.C. § 550?

The foregoing issues, as stated in the pre-trial order, supercede the pleadings and establish the issues to be considered by the court in the trial; *Gorlikowski v. Tolbert, et al,* 52 F.3d 1439, 1443–1444 (7th Cir.1995). However, in defining the issues, the parties have implicitly included legal issues not explicitly identified in the foregoing recitation. For example, the issue identified by the parties in paragraph 4 of their recitation includes an issue un-

---

cember 7, 2006: pg. 325, line 18 through pg. 326, line 2 and pg. 328 line 24 through pg. 329, line 8. This was stipulated to by the parties in the Pre–Trial Order filed on February 15, 2008.

9. The admissibility of Exhibit 24 is limited to an excerpt of the Deposition of Thomas Cahillane taken on December 6, 2006: pg. 178, line 9 through pg. 180, line 12.

der 11 U.S.C. § 548 and parallel Indiana fraudulent conveyance law, i.e., the identity of the initial transferee of an alleged fraudulent conveyance. The issues identified in paragraphs 5, 6 and 7 of the parties' designation implicate 11 U.S.C. § 548 as well, in that 11 U.S.C. § 550 is not a provision which provides any avoidance powers, but rather is one which designates entities from whom a transfer avoided—in this case potentially under 11 U.S.C. § 548—may be recovered. This case is more easily stated, and resolved, by formulating the issues before the court as follows:

1. Whether, pursuant to 11 U.S.C. § 548(a)(1)(A) or § 548(a)(1)(B), transfers were made to New Silicone into the Mercantile account in the amount of $104,039.95.[10]

2. Whether, pursuant to 11 U.S.C. § 548(a)(1)(A) or § 548(a)(1)(B), transfers were made to Timothy Cahillane into the Mercantile account in the amount of $104.039.95.

3. Whether, pursuant to 11 U.S.C. § 550(a)(1), New Silicon is liable as an initial transferee.

4. Whether, pursuant to 11 U.S.C. § 550(a)(1), Timothy Cahillane is liable as an initial transferee.

5. Whether, pursuant to 11 U.S.C. § 550(a)(1), New Silicone is an entity for whose benefit the transfers to Mercantile Bank were made.

6. Whether, pursuant to 11 U.S.C. § 550(a)(1), Timothy Cahillane is an entity for whose benefit the transfers to Mercantile Bank were made.

7. Whether, pursuant to 11 U.S.C. § 550(a)(2), New Silicone is liable as a immediate or mediate transferee.

8. Whether, pursuant to 11 U.S.C. § 550(a)(2), Timothy Cahillane is liable as a immediate or mediate transferee.

9. Whether the corporate form and identity of New Silicone should be disregarded and "pierced" as being used as a vehicle for assisting the Debtor to evade and defraud creditors, resulting in liability of Timothy for all transfers made by the Debtor into the Mercantile account.

10. Whether, pursuant to 11 U.S.C. § 547, Timothy Cahillane is liable for payments made to him, by Thomas Cahillane, in excess of $10,300.00.

11. Whether, pursuant to 11 U.S.C. § 547, Timothy Cahillane is liable for payments made to him, by Thomas Cahillane, in excess of $6,462.00.[11]

12. The extent to which the Trustee is entitled to obtain interest on the amount of avoided transfers determined to be recoverable from either of the defendants.

13. The extent to which the Trustee is entitled to recover attorney's fees from either of the defendants.[12]

---

**10.** The parties initially stated that the amount in dispute was $113,753.95. However, the Trustee has conceded that a deposit of $9714.00 was solely Timothy's funds, and the Trustee has taken this amount out of play [fn. 5, page 14, Trustee's Memorandum].

**11.** In count V of the amended complaint, the Trustee also sought the recovery of a § 547 preference from New Silicone. However, that issue was not raised in the Pre–Trial Order, nor was it presented at trial or briefed: that issue has been waived.

**12.** Paragraphs 8 and 9 of Section H of the Pre–Trial Order designated issues of whether, pursuant to IC 32–18–2–18, New Silicone is liable as an initial transferee, and whether, pursuant to IC 32–18–2–18, Timothy Cahillane is liable as an initial transferee. Neither party mentioned these issues in their post-trial submissions, and the court deems these issues waived for the purpose of submission of the case to the court as defined by the trial, and post-trial, record; *See, In re ABC–Naco, Inc.,* 483 F.3d 470 (7th Cir.2007).

### III. STIPULATED FACTS
### TO BE CONSIDERED
### BY THE COURT

The factual record before the court is in part comprised of the stipulation of facts ("Stipulation") contained in the joint Pre–Trial Order filed by the parties on February 15, 2008, which states *verbatim:*

(1) On October 15, 2004, (the "Petition Date") Thomas J. Cahillane ("Thomas" or the "Debtor") filed a voluntary petition under Chapter 7 of the Bankruptcy Code and commenced the above captioned bankruptcy case (the "Bankruptcy Case").

(2) Prior to the Petition Date, from and after December 1, 2000, Thomas was in default of indebtedness owed by Thomas to Bank One—Indiana, N.A. and NBD Bank, NA, and their successor, Bank One, NA, and JPMorgan Chase Bank, N.A., the successor by merger to Bank One, NA (all of such predecessors and successors shall be collectively referred to herein as "Chase").

(3) Thomas failed to satisfy his indebtedness to Chase and failed to make any regular payments with respect to his indebtedness to Chase at any time after February 1, 2001, through the Petition Date. Chase received cash proceeds generated from the sale of collateral in 2001, real property of Thomas on or about March 31, 2003, and again through the foreclosure and sale of certain real property in February, 2006.

(4) On or about February 2, 2004, New Tech was formed as "New Silicone Technologies, Inc.," an Indiana corporation, through the filing of Articles of Incorporation with the Indiana Secretary of State. On September 9, 2004, the Articles of Organization of New Silicone were amended to reflect the change of New Silicone's name to "New Technologies, Inc.".

(5) On May 14, 2004, Chase commenced the case captioned *Bank One, NA v. Thomas J. Cahillane and Douglas Pierce,* case number 04 CV 202 in the U.S. District Court for the Northern District of Indiana, Hammond Division and therein sought *inter alia* the avoidance of alleged fraudulent conveyances by Thomas and Douglas Pierce, as referenced in Plaintiff's Trial Exhibit No.19.

(6) On May 25, 2004, Thomas was served with the complaint in the case of *Bank One, NA v. Thomas J. Cahillane and Douglas Pierce,* case number 04 CV 202 in the U.S. District Court for the Northern District of Indiana, Hammond Division, as referenced in Plaintiff's Trial Exhibit No. 20.

(7) On May 29, 2004, an Order of Garnishment on Thomas's bank account at Bethlehem Credit Union was entered in the case captioned *Bank One N.A. v. Thomas J. Cahillane, et al; Garnishee Defendants Bethlehem Credit Union, et al* in the LaPorte Superior Court, Michigan City,

Count VIII of the Trustee's amended complaint requests that, pursuant to 11 U.S.C. § 502(d), the court disallow any proof of claim filed by Timothy to the extent that he does not return and repay to the Trustee the amount of any and all avoidable transfers for which he is ultimately liable. Count IX of the amended complaint seeks the same relief, but as to New Silicone. These issues were presented neither in the Pre–Trial Order nor at trial, and were not mentioned in the Trustee's post-trial brief. Neither of the foregoing entities has filed a claim against the estate. As a result, these issues are not ripe for a judicial determination, and moreover have been waived.

Indiana, as referenced in Defendants Exhibit U.

(8) On or about June 2, 2004, Timothy and Thomas personally attended the branch of Mercantile National Bank ("Mercantile") located in Portage, Indiana, met with Mr. Richard Serna of Mercantile and sought the establishment of a depository account. As a result, Mr. Serna established a depository account, number 7404247 (the "Mercantile Account") at Mercantile.

(9) At the time that the Mercantile Account was established, Timothy knew and was aware that Thomas intended to use the Mercantile Account to deposit funds of Thomas.

(10) On June 2, 2004, Timothy executed and delivered to Mercantile a new account authorization and a check signing card (collectively, the "Authorization") reflected in Plaintiff's Trial Exhibits 4–A and 4–B; Defendants' Trial Exhibit N–1 and N–2.

(11) Timothy had the authority pursuant to the Authorization to endorse checks for the payment of money from, or otherwise withdraw or transfer funds on deposit in, the Mercantile Account without the consent of any other person or entity and was granted all powers with respect to the control and use of the Mercantile Account as reflected in the Authorization.

(12) At all times during the period of January 1, 2004, through the Petition Date, the amount of Thomas' indebtedness in the aggregate exceeded all of Thomas' property, at fair valuation.

(13) On June 5, 2004, the amount of the Thomas' indebtedness in the aggregate exceeded the total value of the Thomas' property at that time.

(14) On August 24, 2004, the amount of the Thomas' indebtedness in the aggregate exceeded the total value of the Thomas' property at that time.

(15) After the Mercantile Account was established, funds were transferred into the Mercantile Account as follows:

| Deposit | Date of Transfer | Amount of Funds |
|---|---|---|
| Cash | June 2, 2004 | $ 500.00 |
| Check # 252778 | June 7, 2004 | $ 72,000.00 |
| Deposit Slip/Unknown | July 14, 2004 | $ 9,714.00 |
| Check # 5857 | July 30, 2004 | $ 3,200.00 |
| Check # 5867 | August 11, 2004 | $ 3,397.00 |
| Check # 272925 | August 25, 2004 | $ 13,672.95 |
| Check # 1016 | August 31, 2004 | $ 11,270.00 |
| | Total | $113,753.95 [13] |

(16) On June 7, 2004, Thomas's funds in the amount of $72,000.00 were transferred into the Mercantile Account. On August 25, 2004, Thomas's funds in the amount of $13,672.95 were transferred into the Mercantile Account.

(17) Thomas prepared a document labeled Invoice of New Silicone Technologies, Inc. (Plaintiff's Trial Exhibit No. 3–A) in the amount of $72,000 and delivered the invoice to TICOR Title Company in connection with the closing on the sale of the 512 Franklin Valparaiso, Indiana property job conducted by Thomas.

(18) Thomas was not an employee of New Tech and had no relationship with New Tech in any way.

(19) All transfers of funds into and out of the Mercantile Account were not related to New Tech in any way.

---

13. The actual amount in dispute is $104,039.95. The Trustee, in his post-trial brief, indicates that $9,714.00 was withdrawn in the form of a cashier's check for use at a real estate auction, but stated in the post-trial brief that he is not challenging the avoidability of that deposit due to the fact that the evidence at trial indicated that the proceeds of said check belonged to Timothy. *See, Trustee's Post–Trial Memorandum in Support of Judgment on First Amended Complaint* at pg. 14, footnote # 5; footnote 11, *supra.*

(20) Timothy received and used the following payments by way of checks on the Mercantile Account:

$1,278.04—check # 5102 dated 6/22/04;

$5,000.00—check # 5126 dated 6/23/04;

$184.00—check # 5129 dated 7/28/04.

The checks written on the Mercantile Account having numbers 5126 and 5129 were signed by Timothy.

(21) In addition, in 2004, Timothy received several cash payments, totaling $10,300.00 from Thomas that was for labor and supplies that Timothy provided to Thomas on certain construction/rehab jobs that Thomas was allegedly doing.

(22) New Tech did not use any bank account at any time. The Mercantile Account was the only bank account opened or maintained under the name of New Tech at any time and New Tech did not use the Mercantile Account at any time.

(23) New Tech did not deposit, or otherwise cause the transfer of, any cash, checks or other funds into the Mercantile Account at any time.

(24) New Tech did not withdraw, or otherwise cause the transfer of, any cash, checks or other funds out of the Mercantile Account at any time.

(25) Each and every deposit into, withdrawal from and check written on, the Mercantile Account was completely unrelated to New Tech.

(26) The Mercantile Account was debited on more than twenty-two (22) separate dates to pay creditors on obligations that were not owed by New Tech in any way. Such payments include, without limitation, the following:

(i) The Mercantile Account was debited on or about June 10, 2004, to pay Frank Mattei on an obligation that was not owed by New Tech.

(ii) The Mercantile Account was debited on or about June 21, 2004, to pay Diane Worstell on an obligation that was not owed by New Tech.

(iii) The Mercantile Account was debited on or about June 23, 2004, to pay Bruce Wholesale Flooring on an obligation that was not owed by New Tech.

(iv) The Mercantile Account was debited on or about June 23, 2004, to pay Todd Lewis on an obligation that was not owed by New Tech.

(v) The Mercantile Account was debited on or about June 24, 2004, to pay Sherwin Williams on an obligation that was not owed by New Tech.

(vi) The Mercantile Account was debited on or about June 25, 2004, to pay Menards on an obligation that was not owed by New Tech.

(vii) The Mercantile Account was debited on or about June 25, 2004, to pay Timothy J. Cahillane.

(viii) The Mercantile Account was debited on or about June 29, 2004, to pay Lowes on an obligation that was not owed by New Tech.

(ix) The Mercantile Account was debited on or about July 9, 2004, to pay Pioneer Lumbar on an obligation that was not owed by New Tech.

(x) The Mercantile Account was debited on or about July 12, 2004, to pay the YMCA on an obligation that was not owed by New Tech.

(xi) The Mercantile Account was debited on or about July 13, 2004, to pay Menards on an obligation that was not owed by New Tech.

(xii) The Mercantile Account was debited on or about July 13, 2004, to pay Lowes on an obligation that was not owed by New Tech.

(xiii) The Mercantile Account was debited on or about July 14, 2004, to pay NIPSCO on an obligation that was not owed by New Tech.

(xiv) The Mercantile Account was debited on or about July 23, 2004, to pay COSTCO on obligations that were not owed by New Tech.

(xv) The Mercantile Account was debited on or about July 28, 2004, to pay Todd Lewis on an obligation that was not owed by New Tech.

(xvi) The Mercantile Account was debited on or about July 29, 2004, to pay Sherwin Williams on an obligation that was not owed by New Tech.

(xvii) The Mercantile Account was debited on or about July 29, 2004, to pay Dan Cahillane on an obligation that was not owed by New Tech.

(xviii) The Mercantile Account was debited on or about August 12, 2004, to pay the Valparaiso School District on an obligation that was not owed by New Tech.

(xix) The Mercantile Account was debited on or about August 12, 2004, to pay Chris Guenther on an obligation that was not owed by New Tech.

(xx) The Mercantile Account was debited on or about August 20, 2004, to pay Midwest Rentals on an obligation that was not owed by New Tech.

(xxi) The Mercantile Account was debited on or about September 1, 2004, to pay Mauricio Martinez on an obligation that was not owed by New Tech.

(xxii) The Mercantile Account was debited on or about September 2, 2004, to pay Anthem Insurance on an obligation that was not owed by New Tech.

(27) During the month of July, 2004, a monthly bank statement on the Mercantile Account covering the month of June, 2004, was mailed by Mercantile to the address of 5 Boat Club Drive, Portage, Indiana, which is Timothy's home address.

(28) During the month of August, 2004, a monthly bank statement on the Mercantile Account covering the month of July, 2004, was mailed by Mercantile to the address of 5 Boat Club Drive, Portage, Indiana, which is Timothy's home address.

(29) During the month of September, 2004, a monthly bank statement on the Mercantile Account covering the month of August, 2004, was mailed by Mercantile to the address of 5 Boat Club Drive, Portage, Indiana, which is Timothy's home address.

(30) During the month of October, 2004, a monthly bank statement on the Mercantile Account covering the month of September, 2004, by Mercantile to the address of 5 Boat Club Drive, Portage, Indiana, which is Timothy's home address.

(31) During the month of November, 2004, a monthly bank statement on the Mercantile Account covering the month of October, 2004, by Mercantile to the address of 5 Boat Club Drive, Portage, Indiana, which is Timothy's home address.

(32) New Tech did not have a Board of Directors and correspondingly, meetings of any Board of Directors of New Tech have not occurred at any time.

The other facts pertinent to this decision were provided by the evidence submitted

at the trial; these facts will be recited as necessary in the subsequent sections of this decision.

### IV. LEGAL ANALYSIS

A. *Liability of New Silicone: 11 U.S.C. § 548(a)(1)(A) and § 548(a)(1)(B)*

In order to avoid the transfer of the $104,039.95 to New Silicone, the Trustee asserts both actual fraud pursuant to § 548(a)(1)(A) and constructive fraud pursuant to § 548(a)(1)(B). The purpose of fraudulent conveyance law is to protect creditors from last-minute diminutions of the pool of assets in which they have an interest. *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 892 (7th Cir.1988). Under § 548(a)(1)(A), the court must determine whether it was the Debtor's actual intention to hinder, delay or defraud creditors. *In re Roti*, 271 B.R. 281, 294 (Bankr. N.D.Ill.2002). On the other hand, § 548(a)(1)(B), commonly referred to as "constructive fraud", omits the element of intent. *Id.* The burden of proving a fraudulent transfer under § 548 is on the Trustee. *Frierdich v. Mottaz*, 294 F.3d 864, 867 (7th Cir.2002).

The court shall first determine New Silicone's liability under § 548(a)(1)(B), and then turn its attention to the Trustee's claim of actual fraud. 11 U.S.C. § 548(a)(1)(B) provides as follows:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 1 year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . .

(B)(I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

This court, in the case of *In re First Financial Associates, Inc.*, 371 B.R. 877, 896–97 (Bankr.N.D.Ind.2007)[14], stated the requisite standard of proof under § 548(a)(1)(B) as follows:

The cause of action under § 548(a)(1)(B) is often referred to as "constructive fraud" because it omits any element of intent. *In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1394 (7th Cir.1996). In order for a trustee to establish a fraudulent conveyance under § 548(a)(1)(B), he must prove the following elements: (1) a transfer of the debtor's property or interest therein; (2) made within one year of the filing of the bankruptcy petition; (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) either (a) the debtor was insolvent when the

---

14. The court was citing *In re General Search.* com, 322 B.R. 836, 842 (Bankr.N.D.Ill.2005).

transfer was made or was rendered insolvent thereby; or (b) the debtor was engaged or about to become engaged in a business or a transaction for which its remaining property represented an unreasonably small capital; or (c) the debtor intended to incur debts beyond its ability to repay them as they matured. *Dunham v. Kisak*, 192 F.3d 1104, 1109 (7th Cir.1999); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 505 (N.D.Ill. 1988); *Barber v. Dunbar (In re Dunbar)*, 313 B.R. 430, 434 (Bankr.C.D.Ill. 2004). The trustee must prove each element by a preponderance of the evidence. *Frierdich v. Mottaz*, 294 F.3d 864, 867 (7th Cir.2002); *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 587 (Bankr.N.D.Ill.2005).

New Silicone/New Technologies has conceded liability under § 548(a)(1)(B), as stated as follows:

Plaintiff has "constructive fraudulent" transfer claims against Defendant New Technologies and Timothy Cahillane. Any reasonable interpretation (one that can be made without tongue in cheek) of the evidence and facts before the Court, would show:

1) Transfers of Debtor's property. $104,039.95 of deposits into the Mercantile account of defendant New Technologies.

2) Within one (1) year of the commencement of the case.

3) There was no reasonably equivalent value given by New Technologies for the deposits.

4) Debtor was insolvent.

*Liability and avoidance is set. Defendants New Technologies and Timothy Cahillane concede this step under constructive fraudulent transfer law—both Federal Bankruptcy Code and Indiana statute.* Once "liability" is determined, § 550 liability applies the same standards, logic and analysis whether the avoidance is "actual" fraud or "constructive" fraud. *See, Defendants' Timothy J. Cahillane and New Technologies, Inc. Post–Trial Memorandum*, at pg. 19. (emphasis supplied)

A parenthetical problem is that this admission is somewhat ambiguous as to Timothy Cahillane, who is also a defendant in this case. Clearly, the corporate defendant has conceded liability under § 548(a)(1)(B), and Timothy has conceded the liability of the corporate defendant. But is Timothy Cahillane individually conceding liability as well, insomuch as he would be admitting that the transfers made to *him* were constructively fraudulent? The point has relevance, in that the issue of to whom the transfer was initially made is a critical issue in this case. It is the Trustee's position that the Mercantile Account, although in the name of a corporation, was really Timothy's account, and that as a result Timothy is an initial transferee under 11 U.S.C. § 550(a)(1). On the other hand, it is the defendants' position that this account belonged solely to the corporation, and that Timothy actually received very little of the total money transferred and was thus, at best, a subsequent transferee pursuant to 11 U.S.C. § 550(a)(2).

This distinction is significant because only an immediate or mediate transferee can take advantage of the good faith defense provided under § 550(b). If Timothy is admitting that this was a constructively fraudulent conveyance in relation to him individually, then there is little question that he was an initial transferee.

The court does not deem the foregoing statement to be an admission as to Timothy's personal liability. Prior to making the foregoing statement in their post-trial brief, the defendants stated the following:

"Defendants do not really dispute or contest Plaintiff's factual presentation and conclusions of law regarding the Mercantile account. Plaintiff and defendants are in accord, to a point; and that point ends with Plaintiff's 'quantum leap' that the Mercantile account is Timothy's because Timothy has 'dominion and control' over the account while Debtor did not obtain a personal interest in the account." [15]

This signals to the court that Timothy's concession applies only to the corporate defendant and is not intended to be an admission that Timothy Cahillane was the initial recipient of the conveyance. Timothy has not conceded his liability as an initial transferee. Therefore, based upon the foregoing admission, the court finds for the Trustee as to Count VI of his amended complaint and finds that all transfers made to the Mercantile account, by Thomas Cahillane, in the amount of $104,039.95 are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) as constructively fraudulent conveyances to New Silicone Technologies, Inc./New Technologies, Inc.[16] Furthermore, the Court finds that pursuant to 11 U.S.C. § 550(a)(1), New Silicone Technologies, Inc./New Technologies, Inc. was the initial transferee as to each conveyance. Therefore, the Trustee is entitled to a judgment against New Silicone Technologies/New Technologies in the amount of $104,039.95.

The next issue is whether the transfers to the Mercantile account are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A) as to New Silicone. The defendants have taken the position that they:

> In effect leave the task of arguing and debating Debtor's "actual fraudulent intent" to Debtor. With the prospect and specter of objection to discharge facing Debtor, it is arguably appropriate that Debtor, who is *pro se*, make this argument in this [sic] own right without the precedent and estoppel of Timothy's position.[17]

The defendants seem to contend that, given the concession of liability under § 548(a)(1)(B), there is no reason for the court to decide the Trustee's claims under § 548(a)(1)(A) because " § 550 liability applies the same standards, logic and analysis in determining whether the avoidance is 'actual' fraud or 'constructive' fraud".[18] This purported concession on one theory of the Trustee's amended complaint does not relieve the court of its duty to decide the matter before it, a matter which was both pled in the plaintiff's amended complaint and litigated by the parties at trial. While the court can appreciate the position in which Timothy Cahillane has found himself, the fact of the matter is that there is nothing before the court which even remotely suggests that the Trustee wishes to abandon his claim under § 548(a)(1)(A).

With that said, 11 U.S.C. § 548(a)(1)(A) provides in pertinent part as follows:

---

**15.** *See, Defendants' Timothy J. Cahillane and New Technologies, Inc. Post–Trial Memorandum*, at pg. 14.

**16.** The date and amount of the specific transfers that are avoided as to the Mercantile account: June 2, 2004 in the amount of $500.00; June 7, 2004 in the amount of $72,000.00; July 3, 2004 in the amount of $3,200.00; August 11, 2004 in the amount of $3,397.00; August 25, 2004 in the amount of $13,762.95; and August 31, 2004 in the amount of $11,270.00.

**17.** *See, Defendants' Timothy J. Cahillane and New Technologies, Inc. Post–Trial Memorandum*, at pg. 18–19.

**18.** *Defendants' Timothy J. Cahillane and New Technologies, Inc. Post–Trial Memorandum*, at pg. 19.

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 1 year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

■■■■ The burden of proving a fraudulent transfer under § 548 is on the Trustee; *Frierdich v. Mottaz*, 294 F.3d 864, 867 (7th Cir.2002). A cause of action brought under § 548(a)(1)(A) requires the Trustee to establish that the Debtor had the actual intention to hinder, delay, or defraud creditors; *In re FBN Food Serv., Inc.*, 82 F.3d 1387, 1394 (7th Cir.1996); *In re Roti*, 271 B.R. 281, 294 (Bankr.N.D.Ill.2002). The focus of the inquiry into actual intent is on the state of mind of the debtor; neither malice nor insolvency are required; and culpability on the part of the transferee is not essential. *Roti, supra*, at 294 (*citing, In re Cohen*, 199 B.R. 709, 716–17 (9th Cir.BAP1996)). However, since there is rarely direct evidence of the intent underlying a transfer of property, courts look to circumstantial evidence—referred to as the badges of fraud—to determine whether a transfer was intended to hinder, delay or defraud creditors; *In re Knippen*, 355 B.R. 710, 721–22 (Bankr.N.D.Ill.2006). Therefore, the actual intent to defraud under § 548(a)(1)(A) can be established by, or inferred from, proof of these various "badges of fraud". As stated in *In re Frierdich*, 294 F.3d 864, 870 (7th Cir.2002):

These "badges" include: whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became solvent at the time of the transfer.

Turning to analysis of "badges of fraud" in this case, in *In re Roti, supra*, at 288–89, the following instructive comments were made:

In the period 1997–1999, Act 10, Ltd. ("Act 10") was an Illinois corporation whose sole shareholder was the Debtor. During that period, Act 10, Ltd. did not do any business. Advantage Floor Machine Company ("Advantage") was an Illinois corporation which was incorporated on December 29.1997. The Debtor was its sole shareholder. Hild Floor Machine Co. ("Hild") was an Illinois corporation whose sole shareholder was the Debtor. On September 6, 1997, the Debtor withdrew $ 100,000.00 from his Dean Witter securities account and deposited the proceeds in the bank account of Act 10, Ltd.

On September 11, 1997, the Bank obtained a judgment against the Debtor and Hild in the amount of $ 428,170.75. In an attempt to enforce that judgment, on December 21, 1997, the Bank served a citation to discover assets on the Debtor, which was returnable on January 26, 1998. On January 23, 1998, the Debtor filed his first Chapter 7 petition which listed one creditor—the Bank. That same date, Hild filed a Chapter 11 petition. That case was converted to Chapter 7 on March 19, 1998. The Debtor's case was dismissed on May 8, 1998.

On June 2, 1998, the Bank filed a motion to compel a citation examination of the Debtor in the state court case. On September 30, 1998, a rule to show cause was entered against the Debtor in that case.

On February 4, 1999, ten checks each in the amount of $9,950.00 were issued to the Debtor by the Northern Trust Company from Roseland Limited Partnership ("Roseland") funds. Roseland was a family partnership in which the Debtor was a general partner and Defendants Ann Greco and Julie Marie Nelmark, his daughters, were limited partners. Also on February 4, 1999, fourteen other Roseland partners, including the Defendants, were each issued one check from the Northern Trust in the amount of $99,500.00.

On February 24, 1999, the Debtor was served with the rule to show cause in the state case. On February 27, 1999, Defendant Ann Greco deposited in her bank account three Northern Trust Company checks each in the amount of $ 9,950.00 which the Debtor had endorsed over to her. She was told by the Debtor that he could not open a bank account and he asked her to use her account to pay his expenses. Ann Greco did not enter into any written agreement with the Debtor at or after the date the Debtor delivered to her the three checks totaling $ 29,850.00. Also on February 27, 1999, Defendant Julie Marie Nelmark deposited in her bank account three Northern Trust checks each in the amount of $9,950.00 which the Debtor had endorsed over to her. Like her sister, Julie Marie Nelmark was asked by the Debtor to use her account to pay his expenses. She did not enter into any written agreement with the Debtor at or after the date he delivered to her the three checks totaling $ 29,850.00.

On March 2, 1999, a body attachment for contempt of court was issued by the state court against the Debtor. He was sent notice on March 23, 1999, by the Cook County Sheriff, that a warrant for his arrest had been issued. On April 9, 2001, at the Debtor's request, Defendant Ann Greco wrote a check on her own bank account payable to the Debtor in the amount of $ 10,000.00. April 27, 1999, was the deadline for the Debtor to turn himself into the custody of the Cook County Sheriff or face arrest in the state court case.

On May 12, 1999, the Debtor filed the second and current Chapter 7 petition. See Trustee's Exhibit No. 25. On May 25, 1999, at the Debtor's request, Defendant Julie Marie Nelmark wrote a check on her bank account payable to Act 10 in the amount of $ 15,000.00. On June 17, 1999, at the Debtor's request, Defendant Julie Marie Nelmark wrote a check on her bank account payable to Advantage in the amount of $ 14,000.00. Id. On June 23, 1999, at the Debtor's request, Defendant Ann Greco wrote a check on her bank account payable to the Debtor in the amount of $ 22,000.00. The Debtor endorsed that check over to his former spouse, Defendant Barbara Roti. Id.

On August 11, 1999, the Debtor filed his Schedules in the bankruptcy case, which listed $ 521,275.00 in assets and 970,-686.00 in liabilities. Neither the Schedules nor the answers to his Statement of Financial Affairs, which have never been amended, mention any of the funds resulting from the six Northern Trust Company checks delivered by the Debtor to the Defendants. Id.

The Debtor received $148,491.32 from Roseland during calendar year 1999. According to the Debtor, he spent

$112,095.05 during the period January 28, 1999, to November 2, 1999.

The court found that the Trustee had established the requisite elements under § 548(a)(1)(A), in that the transfers were made within one year of the petition, the debtor was insolvent before and after the transfers, and the transferees were insiders of the Debtor. *Roti, supra,* 271 B.R. at 297. Additionally, in rendering its finding of actual fraud, the court found it relevant that the Debtor retained control of the funds after the transfer; that the transfers had been concealed and not listed on the debtors schedules; and that prior to the transfers, the debtor had been sued by the bank. Furthermore, the court found that the checks had been delivered to the defendants after the bank was awarded a substantial judgment and had engaged in post-judgment collection efforts, and that the defendants gave no consideration to the debtor for the money they received.

██ The similarities between *Roti* and the case now before the court are striking. First, the parties stipulated that the debtor, Thomas Cahillane, was insolvent at the time the transfers were made.[19] Secondly, there is an *enormous* disparity in value between the property transferred and the consideration received: the record is devoid of any evidence that the Debtor received *any* consideration whatsoever from New Silicone for transfers totaling $104,039.45. Additionally, the corporation was wholly owned by Thomas' brother, Timothy. Further, the Debtor failed to disclose these transfers on his schedules and statement of financial affairs, despite the fact that the schedules were subsequently amended.[20] Additionally, as the pre-trial stipulation of facts between the

parties discloses, the Mercantile account was set up *after* a lawsuit was filed by one of the Debtor's largest creditors, Bank One, and *after* this creditor obtained a garnishment order for the Debtor's bank account:

(7) On May 29, 2004, an Order of Garnishment on Thomas's bank account at Bethlehem Credit Union was entered in the case captioned *Bank One N.A. v. Thomas J. Cahillane, et al; Garnishee Defendants Bethlehem Credit Union, et al* in the La-Porte Superior Court, Michigan City, Indiana, as referenced in Defendants Exhibit U.

(8) On or about June 2, 2004, Timothy and Thomas personally attended the branch of Mercantile National Bank ("Mercantile") located in Portage, Indiana, met with Mr. Richard Serna of the Mercantile and sought the establishment of a depository account. As a result, Mr. Serna established a depository account, number 7404247 (the "Mercantile Account") at Mercantile.

(9) At the time that the Mercantile Account was established, Timothy knew and was aware that Thomas intended to use the Mercantile Account to deposit funds of Thomas.

(10) On June 2, 2004, Timothy executed and delivered to Mercantile a new account authorization and a check signing card (collectively, the "Authorization") reflected in Plaintiff's Trial Exhibits 4–A and 4–B; Defendants' Trial Exhibit N–1 and N–2.[21]

In fact, every deposit into the Mercantile account was made between June 2,

---

**19.** *See,* Pre–Trial Order, *Admitted and Stipulated Facts* ¶ 12.

**20.** *See, Trial Transcript,* pg. 197, lines 5–9.

**21.** *See,* Pre–Trial Order, *Admitted and Stipulated Facts* ¶s 7–10.

2004 and August 31, 2004: *after* the garnishment order was entered in relation to the Debtor, and during the pendency of a dissolution of marriage action to which the Debtor was a party. Therefore, it is quite clear that these transfers were made to New Silicone by the Debtor *because* of the pending litigation and *because* the Debtor desired to keep his assets out of the hands of his creditors. Timothy's testimony only confirms this fact:

Q (Trustee's Attorney): Can you tell the Court, did you have lengthy discussions with your brother Thomas about setting up an account at Mercantile Bank?

A: No, not really, it was—it was actually pretty quick. He was—his funds were frozen so as you can imagine that would be pretty crippling if you think about it so he was in a bit of a rush to get it done.

Q: Why was that account opened?

A: The account was opened because my brother asked for my help. He was going through this divorce and, as I said, his accounts were frozen so he had no way of paying his bills to support his kids. He had no way of paying his bills to run his business so it was a pretty significant problem on his shoulders.

Q: Who—who actually picked the Mercantile Bank to open this account open?

A: The best I recall I think that was Tom's suggestion ... [22]

It is abundantly clear that New Silicone was nothing more than a conduit to which the Debtor transferred his property to conceal it from his creditors, while yet maintaining control as a signatory on the account. After its incorporation, the corporation conducted no business, as established by the following:

Q: Mr. Cahillane, isn't it true that New Silicone Technologies did not have a Board of Directors?

A: We had the initial Articles of Incorporation that we sent to the state and they came back. We got a federal tax I.D. after that but after that, no.

Q: I'm sorry to interrupt again, I will probably get to that but the question was, did New Silicone Technologies have a Board of Directors?

A: If I remember right, the Articles of Incorporation papers required that a president be listed, if I'm not mistaken, and that was myself but past that, no, we did not have a full Board of Directors.

Q: Is it true you didn't have any Board of Directors?

A No.

Q: So that is true?

A: Correct.

Q: Isn't it true that New Silicone Technologies, Inc. did not operate any business?

A: We attempted to and it fell through after—after an effort.

Q: Isn't it true that you had negotiations regarding possibly starting up a business but that business never started up?

A: Numerous negotiations, yes.

Q: But the answer is correct?

A: That is correct.

Q: And New Silicone Technologies did not have any employees at any time other than perhaps yourself; correct?

A: That's correct.

Q: Okay. And isn't it true, Mr. Cahillane, that New Silicone Technologies did not prepare or have any corporate minutes?

A: No, never got to that stage.

---

**22.** *See, Trial Transcript, Testimony of Timothy Cahillane,* pg. 119, lines 9–25.

Q: Mr. Cahillane, isn't it true that New Silicone Technologies did not write any checks on the Mercantile account reflected in Plaintiff's Exhibit 4–A?

A: I'm sorry, I got distracted there, could you repeat that?

Q: Isn't it true that New Silicone Technologies did not write any checks on the Mercantile account reflected in Exhibit 4–A?

A: No.

Q: So the answer is true; correct?

A: That's—sorry, yes, that's correct.

Q: Isn't it true that New Silicone Technologies, Inc. did not have any receipts?

A: That's correct, we did not.

Q: Isn't it true that New Silicone Technologies did not earn even one dollar?

A: No, we did not.

Q: So it's correct?

A: Correct.

Q: Isn't it true that New Silicone Technologies did not make even one dollar of payment for employees?

A: That's correct.

Q: Isn't it true that New Silicone Technologies did not file a tax return?

A: That is correct.

Q: Isn't it true that New Silicone Technologies did not borrow any money?

A: That's correct.[23]

The only action the corporate defendant ever took was to open the account at Mercantile, an account for which it had no contemporaneous business use:

Q: So in April or May of 2004 there was no New Silicone other than a corporate shell; correct?

A: That business venture fell at that time.

Q: There was no other business venture for New Silicone at that time?

A: No.

Q: So when you opened up the account in June of 2004, New Silicone didn't need a bank account, did it?

A: No, no, it did not.[24]

None of the deposits or withdrawals into the Mercantile account were related to the corporation in any way. (Stipulation ¶ 22 & 25). The evidence shows that the Debtor, who was in the home improvement business, would invoice his work in the name of New Silicone and would have the customers draft the checks payable to New Silicone. The money would then be deposited into the Mercantile account. All the while, New Silicone had absolutely nothing to do with the work performed. For example, at trial during the Trustee's examination of the debtor, Thomas Cahillane stated:

Q: And do you recall working on a job with respect to Maureen Stelter?

A: Yes, I do.

Q: Okay. Can you describe for the Court that job?

A: It was a carpet purchase.

Q: Do you recall when it happened?

A: It would have been somewhere around that date. This would have been either a deposit or a final payment so within 30 days of that one way or the other.

Q: Can you state the name of the person that you had the job with?

A: Maureen and Randolph Stelter, Stelter.

Q: Do you recall doing a job for the Stelters with respect to new carpet?

---

**23.** *See, Trial Transcript, Testimony of Timothy Cahillane,* pg. 48, line 7 through pg. 50, line 18.

**24.** *See, Trial Transcript, Testimony of Timothy Cahillane,* pg. 128, lines 1–9.

A: Yes.

Q: And after—you did work on that job; correct? Let me rephrase that. Did you do work on that job or you just provided them with carpet?

A: Labor and material.

Q: So there was labor and material on that job?

A: Yes.

Q: Do you recall where that job took place?

A: I'm pretty sure this was their home address—

Q: Okay.

A:—in Crown Point, I'm assuming that.

Q: And you recall receiving payment from the Stelters with respect to that job?

A: Yes, I do.

Q: Is the document reflected in Exhibit 12 a copy—the second document, the check, No. 5867, a copy of the payment that you received from the Stelters for work that you did in connection with the installation of carpet?

A: Yes.

Q: So this—this check, Exhibit 5867, reflects funds that were owed to you; correct?

A: Yes.

Q: This check was your check; correct?

A: Yeah, they owed me the money for it.

Q: And they paid you in the form of this check, 5867?

A: Yes.

Q: And isn't it true that Timothy Cahillane had nothing to do with the work related to the payment reflected in this check?

A: Correct, he had nothing to do with it.

Q: Isn't it true that New Silicone Technologies, Inc. had nothing to do with the payment reflected in this check?

A: No, it was my carpeting business.

Q: It was your personal funds; correct?

A: Personal business, Capital Flooring.

Q: Okay. Can you turn to the top document on that page, Exhibit 12.

A: Deposit slip? Okay.

Q: Is that—do you recall that document to be a deposit slip?

A: It's what it says, yes.

Q: Do you recall depositing this check 5867 with the deposit slip that you just mentioned in a bank account at Mercantile Bank?

A: Do I remember actually making it, no, but I know I did from looking at these documents.[25]

The debtor maintained these practices in relation to the Mercantile account for work he performed at 512 Franklin in the amount of $72,000.00 and for work he performed on behalf of Charles R. Sparks in the amount of $11,270.00.[26] Prior to the start of trial, the parties stipulated to the entry of Exhibit "X" into evidence, which is—in the words of the parties—a "complete and accurate history and account of all credits, deposits, etc. and all checks, debits, and daily balances" of the Mercantile account. Nearly every deposit and

**25.** *See, Trial Transcript, Trial Transcript, Testimony of Thomas Cahillane*, pg. 157, line 11 through pg. 159, line 23.

**26.** *See, Trial Transcript, Testimony of Timothy Cahillane*, pg. 134, line 13 through pg. 135 line 1; *Trial Transcript, Testimony of Thomas Cahillane*, pg. 218 line 22 through pg. 219 line 12 & pg. 223 line 4 through pg. 224 line 15.

withdrawal into the Mercantile account was made by the Debtor and related to either his personal or business dealings. The only activities in the Mercantile account not related to the dealings of the Debtor are a handful of withdrawals made by Timothy Cahillane as follows: check # 5102 in the amount of $1,278.04, check # 5126 in the amount of $5,000.00, check # 5129 in the amount of $184.00.[27] The account was a vehicle for the Debtor; New Silicone had no wheels—as is exemplified by the following:

Q: Isn't it true that New Technologies—New Silicone Technologies, Inc. was not involved with the Mercantile account reflected in Plaintiff's 4–A?

A: That's correct.[28]

The Debtor's intent when he transferred the money to the Mercantile account is quite clear—it was to avoid his creditors. Based upon the foregoing, the court finds for the Trustee as to Count VII of his amended complaint and finds that the transfers made to the Mercantile account by Thomas Cahillane, in the amount of $104,039.95, are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A) as actual fraudulent conveyances to New Silicone[29] Furthermore, the court finds that pursuant to 11 U.S.C. § 550(a)(1), New Silicone was the initial transferee as to each of the conveyances. Therefore, the Trustee is entitled to a judgment against New Silicone Technologies, Inc./New Technologies, Inc. in the amount of $104,039.95.

New Silicone owed no debts to anyone. The Trustee's contentions that New Silicone is an entity for whose benefit transfers were made, or is an immediate or mediate transferee, are resolved by the foregoing.

B. *Liability of Timothy Cahillane: 11 U.S.C. § 548(a)(1)(A) and § 548(a)(1)(B)/11 U.S.C. § 550(a)*

The Trustee, in Counts III and IV of his amended complaint, seeks to hold Timothy Cahillane individually liable as an initial transferee, or as an entity for whose benefit the transfers were made pursuant to 11 U.S.C. § 550(a)(1), for the fraudulent transfers made to the Mercantile account and also for certain transfers Timothy made to himself. 11 U.S.C. § 550 provides in pertinent part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title [11 USCS § 544, 545, 547, 548, 549, 553(b), or 724(a) ], the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

---

**27.** The other transaction was a cashier's check in the amount of $9,714.00 in which Timothy Cahillane was the named remitter. However, the Trustee has indicated that he is not challenging the avoidability of this transfer due to the fact that the evidence at trial indicated that the proceeds of the check were Timothy's.

**28.** *See, Trial Transcript, Testimony of Timothy Cahillane,* Pg. 47, line 24 through pg. 48, line 2.

**29.** The date and amount of the specific transfers that are avoided as to the Mercantile account: June 2, 2004 in the amount of $500.00; June 7, 2004 in the amount of $72,000.00; July 3, 2004 in the amount of $3,200.00; August 11, 2004 in the amount of $3,397.00; August 25, 2004 in the amount of $13,762.95; and August 31, 2004 in the amount of $11,270.00.

(b) The trustee may not recover under section [subsection] (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

The Trustee has put forward a number of theories which, in his view, support of a finding that Timothy Cahillane is personally liable for the Mercantile transfers. First, the Trustee posits that under Indiana law, the account was actually owned by Timothy Cahillane, thereby making him the initial transferee of a transfer avoidable under § 548. Alternatively, the Trustee contends that through Timothy's dominion and control of the Mercantile account, he was the initial transferee of an avoidable transfer of the Debtor's funds. The Trustee also argues that by virtue (or lack of virtue) of his control of the corporation, Timothy was an entity for whose benefit the transfers were made pursuant to 11 U.S.C. § 550(a)(1). Finally, the Trustee contends that the corporate veil of New Silicone should be pierced, and that Timothy Cahillane should be held personally liable under 11 U.S.C. § 548/11 U.S.C. § 550 for the value of all transfers made by the Debtor into the Mercantile account.

1. *Timothy Cahillane as the "Initial Transferee" of a Fraudulent Conveyance*

There is no question that Thomas Cahillane fraudulently transferred property in which he had an interest to the Mercantile account. The Trustee first argues, based upon a document by which the account was initially opened, that the Mercantile account was actually owned by Timothy Cahillane, and that therefore Timothy is an initial transferee pursuant to 11 U.S.C. § 550(a)(1). The Trustee primarily points to the fact that the signature box on the Mercantile account signature card was executed by Timothy personally, and that the signature line for the corporation on this document was left blank.[30] The Trustee argues that, " . . . Timothy intentionally skipped his opportunity to sign as an officer of New Tech." According to the Trustee, this factor—coupled with the testimony of Timothy and the Debtor; the nonexistence of bylaws; the nonexistence of a board of directors; and the questionable capacity of officers authorizing the opening of the account—all indicate that the intent was that the account was to be "owned" by Timothy.[31] Timothy counters that he was merely an agent of the corporation, and that it was a corporate account.

Both the parties seem to agree that the Debtor's interest in the money at issue divested upon the depositing of the funds into the Mercantile account, and thus that "transfers" were made by Thomas Cahillane into the account.[32] So the question is whether this money, once deposited, "belonged" to the corporation as the account owner, or to Timothy Cahillane as the account owner.

In particular the Trustee relies on Defendants' Exhibit # N–1, which is the sig-

---

30. *See, Defendants' Exhibit N–1.*

31. *See, Plaintiff's Exhibit 24* (Deposition Testimony Thomas Cahillane taken on December 6, 2006: pg. 178, line 9 through pg. 180, line 12).

32. A separate transfer was made by each deposit of the Debtor's property into the account. The parties have tended to lump all transfers into a bundle, but actually each transfer is a discrete event for the purposes of § 548.

nature card for the Mercantile account, as the contract between the Timothy and the bank. According to the Trustee, this is the document which evidences Timothy's intent that the account actually belonged to him.

 "(T)he relationship between a depositor and a bank is contractual in nature ...", *Teeling v. Indiana National Bank*, 436 N.E.2d 855, 857 (Ind.App.1982). "A checking account, in particular, is a contract of deposit of funds between a depositor and a financial institution (citation omitted)"; *Wells v. The Stone City Bank*, 691 N.E.2d 1246, 1249 (Ind.App. 1998). When interpreting a written contract, the court must determine the intent of the parties at the time the document was made, and in doing so will examine the language used by the parties when expressing their rights and duties therein. *Reville v. E.E. Brandenberger Construction, Inc.*, 873 N.E.2d 116, 119 (Ind.App. 2007). If the language of an instrument is unambiguous, the intent of the parties is to be determined by reviewing the language contained between the four corners of that instrument. *Evan v. Poe & Associates, Inc.*, 873 N.E.2d 92, 104 (Ind.App.2007). The subjective intent of the parties is irrelevant. *See, Real Estate Support Services, Inc. v. Nauman*, 644 N.E.2d 907, 910–11 (Ind.App.1994). (*held*, "The court does not examine the hidden intentions secreted in the heart of a person, but, rather, examines the final expression found in conduct"). Finally, when interpreting a contract, a court must consider the facts and circumstances leading up to the contract's execution. *Jackson v. Luellen Farms, Inc.*, 877 N.E.2d 848, 857 (Ind.App.2007). In this case, the issue is the legal effect, in relation to the contract between a bank and a depositor, of Timothy's signing the Mercantile account documents in his personal capacity, while leaving blank the signature line for New Silicone.

 Although not precisely on point, the case of *Jackson v. Luellen Farms*, 877 N.E.2d 848 (Ind.App.2007) is instructive. The court was called upon to determine whether the president of Hartford Packing Company, Inc., John K. Jackson, was individually liable on a promissory note (a form of contract) due to the fact that he signed the promissory note to a creditor without indicating his representative capacity on behalf of a corporate entity. The court stated:

> In *Bayh v. Hanna*, 69 Ind.App. 348, 349, 122 N.E. 7, 7 (1919), the defendant signed a promissory note with the company's name on the first line and his own name, followed by "Pres." on the line below. In holding the defendant personally liable on the note, the court stated:
>
> > *The name of the corporation does not appear in the body of the instrument, so there is nothing in the language of the note itself to indicate that it is, or was intended to be, the obligation of the corporation alone, and that it was not also to be the obligation of the appellee.* This being true, we must look to the signatures attached to the note, and there we find two distinct and separate names, each of which is complete within itself. There is nothing whatever on the face of the note in controversy or in the complaint to indicate that the appellee signed it as the agent of the Coal & Clay Company, nor is there anything to show who signed the name of the company. (emphasis supplied)

*Jackson*, 877 N.E.2d, at 856.

In this case, the initial account agreement states, in a section entitled "OWNERSHIP OF ACCOUNT. BUSINESS PURPOSE", that the account owner is a

corporation. The taxpayer identification number provided for the owner of the account in another section is that of New Silicone, and that section has a signature line for "New Silcone", and on that line are the initials "TC". The "account owner" is **specifically** designated as "New Silicone Technologies, Inc." in another section. All of the account statements issued by the bank designated the owner of the account as the corporation. A corporate resolution was provided to the bank with respect to the account, a document which had no purpose if the account were that of an individual. The provision upon which the Trustee relies is essentially one which provides for an exemplar of the signatures of the authorized signatories for account transactions, not acknowledgement of account ownership. All of the checks in relation to this account designated the owner/holder of the account as the corporate defendant, and all checks deposited into the account designated the payee as New Silicone.

The Trustee asserts that the creation of the account was not officially authorized by the corporate board. The Trustee has provided no authority for his contention that the lack of a separate formal resolution in a corporation's minutes invalidates the establishment of a corporate account with a financial institution, a contention which is specious in light of the provision to the bank of plaintiff's Exhibit N–2, entitled "Corporate Authorization Resolution".

The deposit account contract is not ambiguous, and the account was clearly owned by the corporate defendant. Even if the straw at which the Trustee has grasped created an ambiguity, the evidence overwhelmingly establishes that the account was owned by New Silicone. Thus, on this theory, transfers into the account were made to New Silicone, and not to Timothy.

Next is the issue of whether Timothy Cahillane is an initial transferee pursuant to 11 U.S.C. § 550(a)(1) by virtue of Timothy's control and dominion over the account. In *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988), the Seventh Circuit decided the issue of whether European American Bank was an initial transferee in a deposit transaction between it and the debtor. Bonded Financial Services, which was a corporation in which the debtor had an interest, sent the bank a $200,000.00 check payable to the bank's order with a note directing the bank to deposit it into the debtor's account. Subsequently, the debtor instructed the bank to debit the account in the amount of $200,000.00 in order to reduce a balance on a personal loan held by the bank. The court stated:

> Although the Bankruptcy Code does not define "transferee", and there is no legislative history on the point, we think the minimum requirement of status as a "transferee" is dominion over the money or other asset, **the right to put the money to one's own purposes.** When A gives a check to B as agent for C, then C is the "initial transferee"; the agent may be disregarded. This perspective had impressive support under the 1898 Code, e.g., *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 830 (5th Cir.1959) (disregarding corporate forms in order to identify the entity with control over the assets), and has been employed under the 1978 Code as well, e.g., *In re Colombian Coffee Co.*, 75 B.R. 177, 178–79 (S.D.Fla.1987), affirming 64 B.R. 585 (Bankr.S.D.Fla.1986). See also *In re Auto–Pak, Inc.*, 73 B.R. 52 (D.D.C. 1987) (treating the IRS as a mediate rather than initial transferee when the money is washed through a second corporation's account); *In re Jorges Carpet*

*Mills, Inc.*, 50 B.R. 84 (Bankr.E.D.Tenn. 1985) (similar). Cf. Comment, *Guarantees and Section 548(a)(2) of the Bankruptcy Code*, 52 U. Chi. L.Rev. 194 (1985) (advocating recharacterization of three-cornered transactions to find the real beneficiaries).

*Id.* at 893.

While in the case of, *Schechter v. APMC Oil Company, Inc., et al.*, 341 B.R. 638, 641 (Bankr.N.D.Ill.2006) the court addressed the concept of whether the president and majority shareholder of a corporation, by virtue of his ability to *control* the entity, could be an initial transferee for transfers made to the corporation:

> APMC Oil Company was a small Illinois corporation, now dissolved, that compounded and blended motor oil. (P. 7056–2 Resp. at P 2). APMC had its place of business at 5841 West 66th Street in Bedford Park, Illinois. (*Id.*). 5841 Building Corporation managed (and apparently still manages) the building at that address. (*Id.* at P 1). Richard Stiefel was the president and majority shareholder of APMC and is the president and majority shareholder of 5841. (*Id.* at P 3). In 2000 and 2001, Chris Hansen was vice-president of APMC. (*See* Stiefel Mot., Ex. C at 2); *see also Hansen*, 325 B.R. at 751.

> In 1999, APMC received loans from Harris Bank totaling $3,345,000 and in return executed three promissory notes to the Bank. (P. 7056–2 Resp. at P 8). The loans were secured by mortgages on various commercial properties located on 66th Street in Bedford Park. (Stiefel Mot., Ex. D at 1–2). Stiefel signed each of the notes on APMC's behalf as its president. (*Id.*). Stiefel and Hansen also personally guaranteed APMC's obligations under the notes. (P. 7056–2 Resp. at PP 11–12).

> As of September 2001, all the notes were in default. (*Id.* at P 9). On October 1, 2001, Harris Bank accordingly filed an action in the Circuit Court of Cook County, Illinois, against APMC, Stiefel, Hansen, and several other defendants seeking to foreclose on the mortgages and to recover for breach of the notes. (*Id.* at P 16; Stiefel Mot., Ex. G). By January 14, 2005, the amount owed to Harris Bank as a result of the default was more than $3.8 million. (P. 7056–2 Resp. at P 13).

> In June 2001, Hansen sold his house in Lake Forest, Illinois, for $1.3 million, depositing $270,469 in his brokerage account with Fidelity Investments. *See Hansen*, 325 B.R. at 752. On December 26, 2001, Hansen transferred $75,000 from the Fidelity account to 5841. (P. 7056–2 Resp. at P 14); *see also Hansen*, 325 B.R. at 752–53 & n. 5. The next day, he transferred another $25,000 to 5841. (P. 7056–2 Resp. at P 15); *see also Hansen*, 325 B.R. at 753.

> None of the $100,000 Hansen transferred to 5841 in December 2001 was used to satisfy any of APMC's obligations to Harris Bank under the notes. (P. 7056–2 Resp. at P 17). Instead, 5841 used the money to provide operating capital to APMC.

> As a result, the trustee brought a § 548 action against Stiefel, APMC Oil Company and 5841 Building Corporation. The Trustee took the view that Stiefel was the initial transferee and should be individually liable for the transfer due to the fact that he was the president and majority shareholder of 5841. The court disagreed with this argument and stated:

> [To establish this the trustee] would have to adduce evidence that 5841 was actually Stiefel's alter ego, making Stiefel the "initial transferee" of the payments. Several courts, including this

one, have acknowledged or assumed the viability of such a theory. *See, e.g., Peterson v. Hofmann (In re Delta Phones, Inc.)*, Nos. 04 B 823, 05 A 1205, 2005 WL 3542667, at *7, 2005 Bankr.LEXIS 2550 (Bankr.N.D.Ill. Dec.23, 2005) (permitting trustee to amend complaint to allege alter ego claim against members of limited liability company); *Cuthill v. Kime (In re Evergreen Sec., Ltd.)*, 319 B.R. 245, 255–56 (Bankr.M.D.Fla.2003) (assuming viability of theory but finding a failure of proof); *Carolyn's Kitchen v. Cybergenics Corp. (In re Carolyn's Kitchen)*, 209 B.R. 204, 209 (Bankr.N.D.Tex.1997).

*Id.* at 643.

Putting *Bonded Financial Services, Inc.* together with *Schechter*, the court arrives at the proposition that the concept of "dominion and control" in the context of a corporate account requires much more than a showing that an individual is authorized to sign checks with respect to the account. The concept of "dominion and control" is one which looks at the actual result and benefit of account transactions, *in relation to the account as a whole.* Actually, this court deems that this concept, as applied, generally fails to properly analytically address the underlying predicate for the application of section 550, i.e., that the transaction be avoidable under one of the sections designated in section 550(a). In this case the predicate is section 548, and as stated previously, each separate transfer by the Debtor is a discrete act which must be separately analyzed. This approach makes sense, because otherwise a court would be simply "tossing aside" the fact that a corporation is a separate legal entity unto itself. Once established as a corporate entity, whether

or not the corporation functioned as a separate corporate entity in relation to third parties is left to *alter ego* and other theories. The failure to adhere to corporate formalities does not eviscerate the fact that a separate corporate entity exists. In this case, New Silicone is a duly organized corporation under Indiana law and is, therefore, a separate legal entity.[33] Each transfer by the Debtor to the corporate account is a discrete transaction, and the evidence simply does not establish that *as to any specific transfer into the account,* Timothy exercised "dominion and control" of *that transfer* for any particular purpose. As a result, the Trustee's action to assert liability against Timothy as an "initial transferee" under section 550(a)(1) on the theory of "dominion and control" by Timothy over the corporate account—in relation to the Debtor's transfers into the New Silicone account—fails.

2. *Timothy Cahillane as an Entity for whose Benefit the Transfer was Made*

 The Trustee's next theory is that Timothy is an entity for whose benefit the transfers were made, and that Timothy is therefore liable under § 550(a)(1) for the transfers made by the Debtor to the Mercantile account. The court in *Bonded Financial Services* explained what it means to be an entity for whose benefit a transfer was made:

> The paradigm "entity for whose benefit such transfer was made" is a guarantor or debtor—**someone who receives the benefit but not the money.** In the Firm–Guarantor–Lender example at the end of Part I, when Firm pays the loan, Lender is the initial transferee and Guarantor, which no longer is exposed

---

**33.** The record also reflects that New Silicone has a separate federal tax identification number. *See,* Defendants' Exhibits A & C.

to liability, is the "entity for whose benefit". If Bonded had sent a check to the Bank with instructions to reduce Ryan's loan, the Bank would have been the initial transferee and Ryan the "entity for whose benefit". See *In re Universal Clearing House Co.*, 62 B.R. 118, 128–29 (D.Utah 1986); *In re Day Telecommunications, Inc.*, 70 B.R. 904, 909 (Bankr. E.D.N.C.1987); Daniel R. Cowans, 2 *Bankruptcy Law and Practice* § 10.11 (1986). Section 550(a)(1) recognizes that debtors often pay money to A for the benefit of B; that B may indeed have arranged for the payment (likely so if B is an insider of the payor); that but for the payment B may have had to make good on the guarantee or pay off his own debt; and accordingly that B should be treated the same way initial recipients are treated. If B gave value to the bankrupt for the benefit, B will receive credit in the bankruptcy, see 11 U.S.C. § 547(c)(1)(A), § 548(c), and if not, B should be subject to recovery to the same extent as A—sometimes ahead of A, although § 550 does not make this distinction. Someone who receives the money later on is not an "entity for whose benefit such transfer was made"; only a person who receives a benefit from the initial transfer is within this language. (emphasis supplied)

*Id.* at 895–96.

The Trustee contends that Timothy benefitted from the Mercantile account due to the fact that he used it in connection with some real estate auction activities, and that he wrote checks on the account to reimburse himself for expenses he had paid in relation to a construction project on which the Debtor and he were working.[34] The court assumes that as to the auction activities, the Trustee is referring to the cashier's check for ·$9,714.00 which was withdrawn from the account and re-deposited after the auction was unsuccessful. These monies are not being pursued by the Trustee, and in fact in his post-trial brief, the Trustee acknowledged that the evidence showed that this was actually Timothy's money. It is highly questionable how any benefit in this context can be attributed to Timothy. Therefore, the court finds for Timothy with respect to this $9714.00 amount.

█ Next, the Trustee points to certain checks Timothy drew on the account, payable to Timothy, which total $6,462.04. The testimony of Timothy at trial was that these checks were for repayment on a loan he made to the Debtor and for the reimbursement of supplies he purchased while working for the Debtor. These payments were thus made with respect to debts owed by the Debtor to Timothy. The transfers of the Debtor's funds were first made to the New Silicone account. Timothy did not owe a debt to New Silicone. Timothy then caused a transfer to be made to himself for debts owed to him by his brother. The "for the benefit of" analysis would apply if the Debtor made a transfer to New Silicone which caused a debt Timothy owed to New Silicone to be affected, but that's not the case here. Because transfers were made to Timothy *after* property of the Debtor had been transferred by the debtor to the corporate account, Timothy in this case would have been a subsequent or an immediate transferee under § 550(a)(2), *not* an entity for whose benefit a transfer was made. The Seventh Circuit has held that a subsequent transferee cannot be the "entity for whose

---

**34.** The Trustee, in his post-trial brief specifically refers to Plaintiff's Exhibit 26(E), 26(F), 26(L), 26(M), 26(U), 26(W) and 26(X).

benefit" the transfer was made; *Bonded Financial Services, Inc., supra*, at 895.

Based on the foregoing, the court finds that Timothy is not an entity "for whose benefit" any transfer by the Debtor into the Mercantile account was made, and the Trustee cannot recover from Timothy under section 550(a)(1) on this theory.

### 3. *Alter Ego Liability*

▮ The issues presented by the parties become extremely muddled in the context of the Trustee's assertions concerning Timothy's liability under an alter ego theory. Count I of the amended complaint asserted a claim against Timothy, on a theory of piercing the corporate veil of New Silicone, expressly and solely under 11 U.S.C. §§ 541, 544(a) and 105. The final pre-trial order's designation of legal issues presented to the court (Section H) is devoid of any reference to §§ 541, 544(a) and 105.[35] As a result, no issue is presented to the court under these sections; *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1443–1444 [Pursuant to Fed.R.Civ.P. 16(e), the pretrial order supercedes the pleadings and controls the issues presented at trial]. However, paragraphs 4 and 5 of Section H are broad enough to include and present the issue of whether Timothy is liable as an initial transferee of a fraudulent conveyance under an alter ego theory, i.e., New Silicone as an alter ego of Timothy.

What has been presented to the court by the Trustee is the assertion that the corporate form of New Silicone should be pierced, and that Timothy should be held liable on an alter ego theory for all transfers made by the Debtor to the New Silicone account.

Let's be candid here. The focus of the Trustee's action is transfers made by Thomas Cahillane of his property to the Mercantile account of New Silicone. At the time of the transfers, New Silicone was not engaged in business in any way, had no creditors, had no legitimate business purpose for having any funds in a bank account—in point of fact, it was merely a conduit for Thomas Cahillane to "launder" his person funds to keep them out of the reach of creditors. The court has already found that all of the transfers made by the Debtor to the New Silicone Mercantile account were fraudulent transfers for which New Silicone is liable as the initial transferee. But again, the focus is solely the Mercantile account: New Silicone was not involved in any business transaction with

---

**35.** Both parties devoted some portion of their legal memoranda to the general issue of piercing the corporate veil of New Silicone to hold Timothy liable for all transfers made by Thomas to New Silicone. That's fine, but the fact remains that Section H of the pre-trial order, so precise in its delineation of Code sections at issue, omits the foregoing provisions. 11 U.S.C. § 541 has nothing to do with avoidance actions, except to perhaps define the outside scope of a recovery as being required to be "property of the estate" if recovered. There is no authority cited, and none of which the court is aware, that would allow 11 U.S.C. § 105 to serve as a predicate for an action specifically provided for and delineated by another provision of the Code, and bankruptcy courts have no authority to depart from the Code by invoking § 105 to create "equitable" remedies when the Code establishes the scope of a remedy; *Disch v. Rasmussen*, 417 F.3d 769 (7th Cir.2005). Moreover, the Trustee's possible attempt to generally use the alter ego doctrine as a general theory of recovery from Timothy ignores that: "the corporate veil is pierced only where it is clear that the corporation is merely a shell for conducting *the defendant's own business* and where the misuse of the corporate form constitutes a fraud or promotes injustice;" *Commissioner Indiana Department of Environmental Management v. RLG, Inc.*, 755 N.E.2d 556, 563 (Ind.2001). In this case, New Silicone was used to conduct Thomas Cahillane's business, not Timothy's. The alter ego doctrine simply has no applicability under a § 544(a) theory in this case.

anyone. This is not a case in which it can be properly contended that New Silicone was a corporate front for business transacted by Timothy Cahillane, and that Timothy used the corporation for his own general purposes and benefit. Rather, the focus of the action is that Timothy aided and abetted Thomas by allowing a corporate bank account of a corporation of which he was a shareholder [36] to be used as a device by which Thomas was able to shield his property from his creditors.

The issue then becomes the extent to which an alter ego theory may be utilized under 11 U.S.C. § 550(a)(1) to hold Timothy liable as an initial transferee for fraudulent transfers made by Thomas to New Silicone which are avoidable as to New Silicone under 11 U.S.C. § 548.

In *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 895 (7th Cir.1988), the Court stated, quite clearly, that "a subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made." In a prior section of this decision, the court has determined that Timothy was not a "beneficial transferee" under section 550(a)(1). As will be seen, the court will hold that Timothy was an immediate transferee under 11 U.S.C. § 550(a)(2) to the extent of the funds which he personally received from the New Silicone account. Properly understood, the alter ego theory by which an individual is held liable as an initial transferee is a form of determination that said person was the one actually benefitted by a fraudulent transfer, and thus within the scope of § 550(a)(1). While in *Bonded Financial Services, Inc.* the Court stated that the "paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor—someone who receives the benefit but not the money" [838 F.2d 890, 895], the word "paradigm" denotes only an outstandingly clear example, and not the entire universe of possibilities of beneficiary transferees. The alter ego concept fits well within the beneficiary transferee analysis, because the corporation whose veil is pierced is the initial recipient of a transfer for which an individual ultimately receives the benefit. Thus, the controlling principal of *Bonded Financial Services, Inc.* is that transferee liability under an alter ego theory depends upon the actual monetary benefit derived by the beneficiary transferee from the transfer.

The case of *Baldi v. Longview Aluminum, L.L.C., et al. (In re McCook Metals)*, 319 B.R. 570 (Bankr.N.D.Ill 2005) is instructive with respect to its analysis of *Bonded Financial Services, Inc.* The court undertook the following detailed analysis:

> Lynch did not directly receive any part of the McCook contract rights transferred to Longview LLC. The trustee seeks recovery against him as a person "for whose benefit the transfer was made" (a status that can be referred to as "transfer beneficiary" for the sake of brevity). There is little case law analyzing the status of transfer beneficiary, and, as the Seventh Circuit noted in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 895 (7th Cir.1988), the status raises a number of questions whose answers are not apparent from the statutory language, including (1) whether, for a person to be a transfer beneficiary, the transferor must have intended to confer a benefit on that person; (2) whether, to be a transfer beneficiary, a person must have actually received a benefit; and (3) if so, whether the benefit must be quantifiable.

The Seventh Circuit did not answer these questions in *Bonded Financial* be-

---

**36.** The evidence establishes Timothy's stock interests in New Silicone.

cause it found that the allegedly benefited person in that case was a subsequent transferee, a status that it found incompatible with that of transfer beneficiary. 838 F.2d at 895. However, the court did describe the "paradigm" transfer beneficiary—a party whose indemnification obligations or whose own debts are extinguished or reduced by the transfer: "someone who receives the benefit but not the money." 838 F.2d at 895. *Bonded Financial* explained:

> Section 550(a)(1) recognizes that debtors often pay money to A for the benefit of B; that B may indeed have arranged for the payment (likely so if B is an insider of the payor); that but for the payment B may have had to make good on the guarantee or pay off his own debt; and accordingly that B should be treated the same way initial recipients are treated.

*Id.* at 896. Following the *Bonded Financial* description and other relevant considerations, it appears that transfer beneficiary status depends on three aspects of the "benefit": (1) it must actually have been received by the beneficiary; (2) it must be quantifiable; and (3) it must be accessible to the beneficiary. *Actual benefit.* Some decisions dealing with transfer beneficiary status have stated that the transferor's intent to convey a benefit is sufficient in itself to make the intended beneficiary liable under § 550(a)(1). *See, e.g., Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544, 547 (9th Cir. 1991) (citing authority for the proposition that "an entity need not actually benefit, so long as the transfer was made for its benefit.") This approach is effectively criticized in Larry Chek & Vernon O. Teofan, *The Identity and Liability of the Entity for Whose Beneath a Transfer Is Made under Section 550(a): An Alternative to the Rorschach Test,* 4 J. Bankr.L. & Prac. 145 (1995). **The authors point out that liability based on the transferor's intent alone would contradict the well-established rule that fraudulent transfer recovery is a form of disgorgement, so that no recovery can be had from parties who participated in a fraudulent transfer but did not benefit from it.** *Id.* **at 169;** *see, e.g., Federal Deposit Insurance Corp. v. Porco,* **75 N.Y.2d 840, 841, 552 N.E.2d 158, 552 N.Y.S.2d 910, 911 (1990) (finding no cause of action under New York against a person assisting in a fraudulent transfer);** *Mack v. Newton,* **737 F.2d 1343, 1356–57 (5th Cir.1984) (finding no cause of action under Texas law or under the Bankruptcy Act of 1898 for conspiring in a fraudulent transfer).**

Moreover, basing transfer beneficiary liability on the mere intent of the transferor creates a potential constitutional problem. As an example of this problem, Chek and Teofan posit a fraudulent transfer of $100,000 from an individual debtor to his attorney, with directions to deposit the money into a trust fund for the debtor's children, followed by an embezzlement of the funds by the attorney. 4 J. Bankr.L. & Prac. at 148. The authors observe that imposing liability on parties like the children in this hypothetical—"merely because of the debtor's subjective intent and the trustee's decision to name [them]"—could be seen as a deprivation of property without due process. *Id.* at 156 & n. 63.

**Finally, requiring that a benefit actually be received, not just intended, is consistent with the** *Bonded Financial* **paradigm—the** *receipt* **of a benefit without a direct transfer of the debtor's property.** 838 F.2d at 895. *Bonded Financial's* **example is a transfer to a third party who is owed money by**

the beneficiary, reducing the beneficiary's liabilities. By like reasoning, transfer beneficiary status would result when a transfer to a third party increases the beneficiary's assets. But either way, an actual benefit rather than a merely intended one must be received in order for the beneficiary to be liable under § 550(a)(1).

*ii. Quantifiable benefit.* A corollary to the disgorgement-based requirement that a benefit actually be received is a requirement that it be quantifiable. A merely theoretical benefit is not sufficient, since it would not be subject to disgorgement. This rule was applied in *Telesphere Liquidating Trust v. Galesi,* 246 B.R. 315, 322–23 (N.D.Ill.2000). At issue in *Telesphere* was the transfer to lenders of a security interest in all of an insolvent corporation's property in connection with a leveraged buyout. The plaintiff alleged that this transfer benefited a corporate insider by giving him an opportunity to realize a return on his equity investment that he would not have realized had the corporation been liquidated. The district court acknowledged that "there is an unequal distribution of risk involved when insolvent enterprises engage in high-risk transactions," but pointed out that in fact the leveraged buyout was unsuccessful from the outset, so that the insider never received any actual benefit. *Id.* at 322. The district court accepted the bankruptcy court's application of the "traditional limitation" of transfer beneficiary status to situations of "a particularized quantifiable benefit," rather than expanding the status "to allow recovery for such unquantifiable and uncertain benefits as those at issue here." *Id.* at 323.

*iii. Accessible benefit.* The third requirement for transfer beneficiary status-that the benefit be accessible to the beneficiary—also follows from the disgorgement-based requirement of actual receipt. Even if a quantifiable benefit is actually received, it could not fairly be disgorged if the beneficiary never had access to it. For example, an insolvent debtor might transfer property to a corporation that he controls, but that also has minority shareholders. A fraudulent transfer benefits those shareholders in a quantifiable fashion—a share of the value of the transferred property proportionate to their share of the corporation's equity. However, without control of the corporation, they may have no access to this benefit. Of course, if the corporation prospers, the corporation itself can disgorge the value of the property. But if the corporation becomes insolvent, and if it made no distribution to the minority shareholders subsequent to the fraudulent transfer, they would never have had access to the benefit they received, and there would be no basis to require disgorgement of them.

*Id.* at 590–92. (emphasis supplied).

The foregoing define the parameters of the Trustee's alter ego theory vis-a-vis Timothy. Piercing the corporate veil of New Silicone to reach Timothy is only as good as the benefits Timothy received from the Debtor's fraudulent transfers to the New Silicone account. The only benefits Timothy received at all were the payments he himself caused to be made to reimburse himself, in the amount of $6462.04. He was an immediate transferee of these payments under § 550(a)(2), and thus cannot be a beneficial transferee under § 550(a)(1), as clearly and unequivocally stated by the Seventh Circuit in *Bonded Financial Services, Inc., supra.*

Based upon the foregoing, the Trustee's alter ego theory cannot be sustained as to Timothy.[37]

4. *Timothy as an Immediate Transferee Under 11 U.S.C. § 548(a)(2)*

 The Debtor made transfers into the New Silicone account, all of which were fraudulent under 11 U.S.C. § 548(a)(1)(A) and (B). Timothy transferred $6462.04 of the New Silicone account funds to himself. Timothy is an immediate transferee of $6462.04 of the New Silicone account funds fraudulently transferred to that account by the Debtor.

Timothy has raised the good faith transferee defense under 11 U.S.C. § 550(b)(1). The only funds that came into his possession were those conveyed by the following checks: # 5102, # 5126 and # 5129, in the total amount of $6,462.04.

 In order to successfully raise the good faith defense under § 550(b), the subsequent transferee must have (a) taken the property for value, including satisfaction or securing of a present or antecedent debt; (b) taken the property in good faith; and (c) taken the property without knowledge of the avoidability of the initial transfer; 11 U.S.C. § 550(b)(1); *Bonded Financial*, 838 F.2d at 896; *Grochocinski v. Knippen, et al. (In re Knippen)*, 355 B.R. 710, 728–29 (Bankr.N.D.Ill.2006). All three of the foregoing criteria must be met to sustain the defense. We'll concede (a) and (c) to Timothy, *in arguendo* (although (c) is questionable).

Let's look at (b). When formulating a standard to determine "good faith" the Seventh Circuit in *Bonded Financial* stated:

> The phrase "good faith" in [§ 550(b) ] is intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a transfer from him, that is, "washing" the transaction through an innocent third party. In order for the transferee to be excepted from liability ... he himself must be a good faith transferee.

H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 376 (1978); S.Rep. No. 95–989, 95th Cong., 2d Sess. 90 (1978) [U.S.Code Cong. & Admin.News 1978, p. 5787]. The trustee contends, instead, that the Bank should have known about Bonded's distress and Ryan's chicanery; had it investigated the deposit on January 21, it would have found out; and because it should have known, this is as good as knowledge.

Imputed knowledge is an old idea, employed even in the criminal law. See *United States v. Ramsey*, 785 F.2d 184, 189–90 (7th Cir.1986). Venerable au-

---

**37.** The Trustee has essentially argued, and the facts do actually demonstrate, that Timothy conspired with Thomas to enable Thomas to utilize the New Silicone account as a mechanism by which Thomas could hinder or delay his creditors. As analyzed in *Baldi v. Longview Aluminum, L.L.C., et al., supra.*, there is no actionable claim under § 550(a)(1) with respect to one who assists in a fraudulent conveyance but receives no benefit from it. Again, while the parties have dimmed the focus of the § 548 action, each deposit made by Thomas was a separate transfer, and only transfers totaling $6462.04 benefitted Timothy. This result is interestingly consistent with Indiana fraudulent conveyance law, which does not recognize a separate cause of action for civil conspiracy to commit fraud; *American Heritage Banco, Inc. v. McNaughton*, Ind.App., 879 N.E.2d 1110, 1115 (2008). Under Indiana law, "the corporate veil is pierced *only where it is clear that the corporation is merely a shell for conducting the defendant's own business* ..."; *Commissioner, Indiana Department of Environmental Management v. RLG, Inc*, 755 N.E.2d 556, 563 (Ind.2001): In this case, New Silicone's account was used to conduct the Debtor's business, not Timothy's. While the circumstances of this case may illuminate a "legal loophole", there is no cause of action for this illuminated passage.

thority has it that the recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate. See *Dokken v. Page,* 147 F. 438 (8th Cir.1906) (knowledge that the debtor is transferring almost all of its assets); Garrard Glenn, *Fraudulent Conveyances* § 295 (1931). No one supposes that "knowledge of voidability" means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do. *In re Nevada Implement Co.,* 22 B.R. 105 (Bankr. W.D.Mo.1982); Countryman, 3 Bankruptcy Developments J. at 476–77. Some facts strongly suggest the presence of others; a recipient that closes its eyes to the remaining facts may not deny knowledge. See *Bosco v. Serhant,* 836 F.2d 271, slip op. at 8–12 (7th Cir. 1987). But this is not the same as a duty to investigate, to be a monitor for creditors' benefit when nothing known so far suggests that there is a fraudulent conveyance in the chain. "Knowledge" is a stronger term than "notice", see *Smith v. Mixon,* 788 F.2d at 232. A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own.

Nothing in the record of this case suggests that the Bank knew of Bonded's financial peril or Ryan's plan. Bonded was not the Bank's customer. The transfer from Ryan to the Bank on January 31 was innocuous. The Bank thought it got Ryan's money; its loan was fully secured; it perceived Ryan as a well-heeled horse breeder, with a balance sheet in the millions, current on his loan payments.

The transfer from Bonded to Ryan on January 21 was only slightly more problematic from the Bank's perspective.

A corporation was transferring $ 200,000 to one of its executives. This does not hint at a fraudulent conveyance by a firm on the brink of insolvency; for all the Bank knew, Bonded had plenty more where the $200,000 came from. Banks frequently receive large checks from corporations to their officers; think of the annual bonus checks General Motors issues, or the check to repurchase a bloc of shares. A $200,000 check is not a plausible bonus for a currency exchange, however. It could hint at embezzlement. Several Illinois cases say that a bank should inquire when a firm's employee signs a large check with himself as payee. See *People ex rel. Nelson v. Peoples Loan & Trust Co.,* 285 Ill.App. 552, 2 N.E.2d 763 (1st Dist.1936); *Milano v. Sheridan Trust & Savings Bank,* 242 Ill.App. 362 (1st Dist.1926).

*Bonded Financial,* 838 F.2d at 897–98.

█ Compare the bank in the foregoing to Timothy in the instant case. In this case, Timothy knew that the Debtor's personal account was frozen and that creditors were actively pursuing Thomas. Yet, he opened an account at Mercantile Bank for a corporation not engaged in business; held his brother out to be an employee of the corporation, though he clearly knew that there was no employer; and allowed the corporate account to be utilized in such a manner that the Debtor was able to conduct his personal affairs without creditor interference. Timothy was not acting in good faith.

Timothy was an immediate transferee of fraudulent transfers in the amount of $6,462.04, and the Trustee is entitled to judgment against Timothy in that amount pursuant to § 550(a)(2).

### C. *Timothy's Preference Liability*

The Trustee seeks the recovery of certain payments made to Timothy Cahillane

pursuant to 11 U.S.C. § 547(b). 11 U.S.C. § 547(b) provides as follows:

b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title [11 USCS §§ 701 et seq.];

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title [11 USCS §§ 101 et seq.].

■■■■ As is clear on the face of the statute, in order to avoid a transfer, the transfer must be of an interest of the debtor in property—*Warsco v. Preferred Technical Group*, 258 F.3d 557, 564 (7th Cir.2001)—and must meet all five of the foregoing criteria; *Warsco v. Preferred Technical Group; In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1171 (7th Cir.1996). As stated in both of the foregoing cases, the Trustee has the burden of proof on all elements. There is a presumption that the debtor is insolvent, as a matter of law, during the 90 days prior to the bankruptcy petition filing date; 11 U.S.C. § 547(f); *See also, Barash v. Public Fin. Corp.*, 658

F.2d 504, 507 (7th Cir.1981). The defendant must present evidence to rebut the presumption, but that does not relieve the plaintiff of the ultimate burden of proof on this element to establish a prima facie case under § 547(b). *See, In re Taxman Clothing Co.*, 905 F.2d 166, 168 (7th Cir.1990).

■■■■ As to the hypothetical liquidation test under § 547(b)(5), a court must determine whether a creditor received more (as result of alleged preferential transfers) than it would have received in a Chapter 7 distribution. Courts have held that the hypothetical liquidation test is to be performed as of the date of filing. *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1936); *Matter of Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1171 (7th Cir.1996); *Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819, 822 (6th Cir.1986); 4 *Collier on Bankruptcy*, ¶ 547.08 at 547–45 (15th ed.1995). In other words, when the trustee brings a § 547(b) preference suit, the court is required to determine what a targeted creditor would have received if the estate was liquidated and distributed to the creditors as provided in chapter 7 on the date that the bankruptcy petition was filed, and whether the creditor in question received more than that amount. *Matter of Superior Toy & Mfg. Co., Inc.*, 78 F.3d at 1171. In the case of *marchFirst*, the court found that the testimony of the trustee is sufficient to satisfy this element:

The trustee's testimony is sufficient to establish this element of a preference cause of action. *See e.g., Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Millard Partners)*, 145 B.R. 682 (D.Colo.1992), *aff'd*, 12 F.3d 1549 (10th Cir.1993) and Kellman, 122 B.R. 897.

Here, the Trustee submitted an affidavit stating that:

Based on my personal knowledge of the administrative, priority, and unsecured claims on file in the Debtor's bankruptcy case as of the date of this affidavit, and based on my knowledge of the dollar value of the assets of the estate that have been administered to date and that remain to be administered, I do not anticipate or reasonably expect to be able to make a 100% distribution to creditors having filed pre-petition general unsecured claims in this case.

Without any evidence rebutting the Trustee's affidavit, the court finds for the Trustee on this issue. This was the only contested issue on the Trustee's case. Having resolved it in favor of the Trustee, the court now finds that the Trustee has proved his *prima facie case.* The court now turns to IDC's motion for summary judgment.

*In re marchFirst,* 381 B.R. at 695.

First at issue are amounts totaling $6,462.04, which were transferred to Timothy from the Mercantile account by checks # 5129 ($184.00), # 5102 ($1,278.04) and # 5126 ($5,000.00). Also at issue are $10,300.00 in payments received by Timothy over approximately one year, which were not paid to him from the Mercantile account.

Timothy claims that checks # 5129 and # 5102 were paid for the reimbursement of expenses for materials and supplies that he incurred on one of the debtor's residential housing rehabilitation jobs, and that the checks constituted a contemporaneous exchange of value. Timothy asserts that check # 5126 was for the repayment of a loan he made to the debtor. The payments totaling $10,300.00, according to Timothy, were wages for work he performed for the Debtor on certain rehabilitation projects.[38]

■■■■■ Let's look first at the payments totaling $6,462.04, transferred to Timothy from the Mercantile account. As determined in foregoing sections of this memorandum, the money in the account was not property of the Debtor, but rather property of New Silicone when the payments to Timothy were made. Thus, one might argue—as does Timothy—that payments made to Timothy from the account did not constitute property of the Debtor *when transferred,* and thus that a predicate requirement for § 547(b) has not been satisfied. One might also argue—as does Timothy—that New Silicone had no debt to Timothy when these payments were made, and thus that §§ 547(b)(1) and (2) have not been satisfied. But those might not be very good arguments in view of the determination made above that Thomas' transfers to New Silicone were fraudulent as to Thomas' creditors, *if* the result of the § 548 action against New Silicone is to *ex post facto* transform property owned by an entity separate form the Debtor into property of the Debtor as of the date of the § 547 "transfer". The Court does not view this result to be the manner of opera-

---

**38.** The Trustee contends that Timothy produced no records or receipts to demonstrate that checks # 5129 and # 5102 were for the reimbursement of expenses. Moreover, the Trustee argues that there are no documents in evidence which support the repayment of a loan (check # 5126), except a check dated May 23, 2004, written in the amount of $4,800.00. In the words of the Trustee, "there is no evidence that a loan was even made to the Debtor by Timothy". Putting aside that the Trustee has other problems in making his case, there is ample evidence of the nature of these payments, from the testimony of both Timothy and the Debtor. There is no requirement anywhere, akin to the best evidence rule (which has nothing to do with this circumstance), which requires documentary proof of Timothy's assertions. The court finds the testimony to be credible, and finds that the payments were made for the reasons asserted by Timothy.

tion of § 548. There is nothing in that statute which provides for this form of retroactive result. The statute provides that a transfer may be "avoided", not that it is a nullity, or "void", from its inception: if it were "void", then there could be no valid subsequent transfer under any circumstance, and the liability provisions of § 550(a) would be superfluous. In fact, the scheme of § 550(a)—providing that the original transfer or its value may be recovered from certain transferees under certain circumstances—only confirms the principle that a transfer, although avoided, retains its quality as a transfer when made despite the subsequent avoidance. Thus, with respect to the payments totaling $6,462.04, transferred to Timothy from the Mercantile account, the Trustee's preference action fails due to non-satisfaction of the requirements of a transfer of property of the Debtor, and of the criteria of §§ 547(b)(1) and (2). The fact that the Trustee has been able to avoid the transfer under § 548 as to New Silicone does not alter the fact that when the transfers were made to Timothy, they were made to him by an entity other than the Debtor.

■■■■ The payments totaling $10,300.00 stand on a different footing. Thomas testified that perhaps certain of these payments were made to Timothy not by Thomas, but by the owner of a property on which Timothy had worked. Even assuming that to be the case, there is no evidence of a debt owed to Timothy by the property owner—rather, the court finds the facts to be that the owner contracted with Thomas, Thomas contracted for services separately with Timothy, and then perhaps Thomas directed that the owner perform a sort of novation by satisfying his debt to Thomas by paying Thomas' debt to Timothy. These payments, totaling $10,300.00, constitute transfers of property of Thomas to Timothy, for the benefit of Timothy as a creditor of Thomas, on account of an antecedent debt. To the extent that Thomas seeks to assert the "contemporaneous" new value defense of § 547(c)(1), the court finds from the evidence that Timothy has failed to prove the element of § 547(c)(1)(B), that the exchanges be "substantially contemporaneous". There is no evidence in the record that the time of any payment made by Thomas to Timothy was closely temporally related to the date of Timothy's performance of services under his arrangement with Thomas. There is really no issue at all as to the repayment of the $5000.00 loan as being defensible under § 547(c)(1).

But the Trustee's preference action as to the $10,300.00 of payments fails for another reason. Even if one were to assume that the first four elements of § 547(b) are met, no evidence was offered by the Trustee, or by anyone else, which satisfies § 547(b)(5).[39]

■■■■ Under § 547(b)(5), the court is to construct a hypothetical liquidation of the estate in order to determine the actual effect of the payments. *In re Western World Funding, Inc.*, 54 B.R. 470, 472 (Bankr.D.Nev.1985). The hypothetical liquidation is to be conducted "as of" the petition date; *In re Tenna Corp.*, 801 F.2d 819 (6th Cir.1986). In his brief, the Trustee requested that the court take judicial notice of the schedules and claims register, and then reach a determination as to whether Timothy received more than he should have. At trial, the Debtor's schedules were entered into evidence; however the claims filed in this case and the claims

---

**39.** Timothy argues that the Trustee's liqui-, dation analysis is incorrect, and that he was a priority wage earner with respect to $10,300.00 of the payments. According to Timothy, 11 U.S.C. § 507(a)(4) would provide him with a safe haven for $4,925.00. This is a good argument, but irrelevant as it turns out.

register were not. The evidence in this case closed on March 13, 2008. If the Trustee had documents he wanted this court to consider, such as the claims filed to date, then he should have moved for their entry into evidence at trial. In fact, after reviewing the transcript, the court notes the liquidation component of § 547(b) was not mentioned by either party at trial.

However, even were the schedules and claims to be in evidence, the testimony of the Trustee, or at least someone who is intimately involved in the liquidation and administration of the estate, is indispensable. The court has no idea how much has been received by the Trustee in the liquidation of this estate; what is anticipated to be received from pending third party avoidance actions presently before the court; what the administrative costs and expenses may be; and what the allowed claims might be, given that the Trustee can still object to claims. The Debtor's schedules do not provide the necessary proof of reasonably certain anticipated value of the estate for distribution, and the claims register does not establish the anticipated distribution pool. The court does not expect, and could not expect, the satisfaction of § 547(b)(5) to be evidentiary rocket science, but it takes more than the kite floated by the Trustee in this case to sustain the element required to be established under that provision; See, In re Connolly North America, LLC, 398 B.R. 564 (Bankr.E.D.Mich., 2008).

Because the Trustee has failed to establish the element of 11 U.S.C. § 547(b)(5), judgment will be entered for Timothy on the Trustee's claims under 11 U.S.C. § 547(b).

### D. Pre–Judgment Interest and Attorneys' Fees

 To the extent he has been successful in his avoidance/recovery actions, the Trustee is entitled to pre-judgment interest. The date from which prejudgment interest accrues is the date of demand for return of transferred property, or the date of the filing of the adversary proceeding seeking recovery of property, whichever is earlier. In this case, the record establishes the date of the filing of the adversary complaint as the appropriate date, and thus pre-judgment interest is awarded from October 13, 2006 to the date of entry of judgment with respect to the recoveries adjudged for the Trustee. See, In re Industrial and Mun. Engineering, 127 B.R. 848 (Bankr.C.D.Ill.1990).

 The next question which arises is the rate at which interest is to be imposed. As stated in Cement Division, National Gypsum Co. v. City of Milwaukee, 144 F.3d 1111, 1114 (7th Cir.1998):

> Unlike postjudgment interest, there is no statutory rate of prejudgment interest, see Gorenstein Enters. v. Quality Care–U.S.A., Inc., 874 F.2d 431, 436 (7th Cir.1989), and the amount of prejudgment interest required to properly compensate the victim can vary depending on the particular circumstances of the case. Accordingly, we entrusted the details of the calculation to the discretion of the district court, see [Cement Division, Nat. Gypsim Co. v. City of Milwaukee,] 31 F.3d [581], at 587, and our review is limited to whether the district court has reasonably applied the appropriate federal common law principles-including the guidance provided by our previous opinion. See United States v. Taylor, 487 U.S. 326, 336, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988); Cook v. Niedert, 142 F.3d 1004, 1011 (7th Cir. 1998). In our opinion remanding for determination of prejudgment interest, we indicated that "the best starting

**214**

point is to award interest at the market rate, *which means an average of the prime rate for the years in question.* 31 F.3d at 587 (emphasis added).

The foregoing statement was made more conclusive in *First National Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir.1999), as follows:

> Our practice has been to use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court engages in "refined rate-setting" directed at determining a more accurate market rate for interest. *Cement Division, National Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998); *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1332 (7th Cir. 1992). We hold today that to set aside this practice and award something other than the prime rate is an abuse of discretion, unless the district court engages in such a refined calculation.

The "prime rate" is that reported by the Federal Reserve Board; *see, Till v. SCS Credit Corporation*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004). The concept of "average prime rate" is meant to apply to a circumstance in which a single sum is payable upon a date certain. The issue is what the "average" of the prime rate for "the years in question" as the prime rate can fluctuate drastically within a year.

Following the dictates of *Cement Division, National Gypsum Co., supra.*, the pre-judgment interest rate in this case is to be the "average of the prime rate for the years in question". This is not a "weighted" average, which would be far too complicated to determine by anyone other than a mathematician. It is impossible to precisely determine what the Seventh Circuit has decreed. The prime rate

on October 13, 2006 was 8.25%; the prime rate now is 3.25%. In order to calculate the appropriate rate of interest the court will add together the respective prime rates of interest determined by the Federal Reserve Board throughout the period beginning with the date of the filing of this adversary proceeding to the date of entry of judgment, and to then divide this sum by the number of prime rate changes during that period. The sum of the separately-established prime rates for the period is 65.25, and there were 11 separate prime rates set between October 2006 and the date of judgement (which includes the prime rate as of the date of filing the adversary complaint). The resulting rate of pre-judgment interest is therefore 5.93%.[40]

■■■■ The Trustee also requests attorneys' fees, but fails to cite any provision in the Bankruptcy Code which warrants such an award. Neither § 548 nor § 550 of the Bankruptcy Code specifically authorize an award of attorneys' fees to a prevailing party. In bankruptcy cases, the "American Rule" applies, which provides that in cases that are based upon or involve federal law, attorneys' fees are not allowable absent a statutory basis or enforceable contract between the parties. *In re H. King & Associates*, 295 B.R. 246, 294 (Bankr.N.D.Ill.2003) (*citing, Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)); *See, In re Reid*, 854 F.2d 156, 161–62 (7th Cir.1988). The Trustee is not entitled to recover attorneys' fees.

## V. *CONCLUSION*

IT IS ORDERED, ADJUDGED AND DECREED:

---

**40.** The court's formula for the computation of pre-judgment interest was recently affirmed in *In re Radcliffe*, 563 F.3d 627, 633 (7th Cir.2009).

A. The Plaintiff shall have and recover judgment against the defendant New Technologies, Inc./New Silicone Technologies, Inc., pursuant to 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 550(a)(1), in the amount of $104,039.95.

B. The Plaintiff shall have and recover judgment against the defendant New Technologies, Inc./New Silicone Technologies, Inc., pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 550(a)(1), in the amount of $104,039.95.

C. The Plaintiff shall take nothing by his complaint against Timothy J. Cahillane under 11 U.S.C. § 548(a)(1)(A)/11 U.S.C. § 550(a)(1), and judgment is entered in favor of the defendant on these claims.

D. The Plaintiff shall take nothing by his complaint against Timothy J. Cahillane under 11 U.S.C. § 548(a)(1)(B)/11 U.S.C. § 550(a)(1), and judgment is entered in favor of the defendant on these claims.

E. The Plaintiff shall have and recover judgment against the defendant Timothy Cahillane, pursuant to 11 U.S.C. § 548(a)(1)(B)/ 11 U.S.C. § 548(a)(1)(A)/11 U.S.C. § 550(a)(2), in the amount of $6,462.04.

F. The Plaintiff shall take nothing by his complaint against Timothy J. Cahillane under 11 U.S.C. § 547(b), and judgment is entered in favor of the defendant on these claims.

G. The amounts recovered by the Plaintiff shall include interest at the rate of 5.93% from October 13, 2006 to the date of entry of judgment.

H. The Plaintiff shall take nothing by his complaint against the defendants with respect to his claim for attorney's fees, and judgment is entered in favor of the defendants on these claims.